THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RA-
MÓN ANTONIO FOURNIER SAMPEDRO, Defendant and Ap-
pellant.

No. 15318. Argued April 6, 1953.—Decided November 5, 1954.

212

*Benicio Sánchez Castaño, Ricardo Lacosta, Jr., Félix Ochoteco, José R. Fournier, Juan A. Pedrosa, Santos P. Amadeo,* and *Juan B. Soto* for appellant. *José Trías Monge, Attorney General, J. Rivera Barreras, Fiscal of the Supreme Court* (on the brief), *Rafael L. Ydrach Yordán, Assistant Fiscal of the Supreme Court,* and *Jaime García Blanco, Special Fiscal,* for appellee.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

An information was filed in the former district court charging Ramón Antonio Fournier Sampedro with the crime of first degree murder. The charge was that on September 7, 1950 Fournier killed his ex-wife, Iris Nereida Hernández Matos, by strangling her. He was tried by a jury, convicted, and sentenced to life imprisonment.

The problem with which we are principally concerned in this appeal is whether confessions of the defendant were improperly admitted in evidence. To discuss that question adequately, we must first set forth *in extenso* the testimony presented during the trial.

I

*Summary of testimony adduced at the trial*

Dr. Donald F. Babbs testified that on October 8, 1950 at 11:30 a.m. he was present at the Fournier Cemetery at Isla Verde when tomb No. 4 was excavated and the body of a woman, later identified as Iris, was taken out of tomb No. 4. The body was fully clothed with a dress, two half-slips, a brassiere, and a pair of panties. The underclothes were in their regular, normal position, but the skirt of the dress was over the woman's head and a handkerchief was tied over the mouth and face. A woman's handbag and a box of Kleenex were found inside the dress. A bracelet was on the arm and a diamond ring on the hand of the body. There was a woman's cloth belt around the neck of the body in the form of a tourniquet. The belt had been wound twice around the neck

and then twisted. The belt was knotted and inside the knot there was a 4-½ in. nail. The witness identified all of these objects and they were subsequently admitted in evidence. The next day the witness performed an autopsy on the body. Death had occurred 4 to 6 weeks prior to the autopsy. The larynx had been fractured in two places and the trachea had been compressed. The injuries to the larynx and the trachea had been caused by strong pressure from the outside. The witness believes this must have resulted from the winding of the belt twice around the neck and twisting it, which made two deep depressions in the flesh of the neck. The dead woman had been 5 ft. 2 in. tall and appeared to weigh 110 lbs. The cause of death was strangulation by garrotting with a belt. The witness believes that the injury and strangulation could not have been produced by the woman herself: before the belt was tight enough to kill her, she would have been unconscious and would have turned the belt loose.

The testimony of the next few witnesses, who were employees of the Fournier Cemetery, established by undisputed circumstantial evidence that on September 7, 1950 at approximately 11 p.m. the defendant had buried the body of Iris in the condition and with the objects described by Dr. Babbs in tomb No. 4 of the Fournier Cemetery, which was managed and partly owned by the defendant.

Juan Ponce López testified that he is the caretaker of the Fournier Cemetery which is located in Isla Verde on the road from Santurce to Carolina. As caretaker, he keeps the keys to the cemetery. He opens the gates of the cemetery at 7 a.m. and closes them at 6 p.m. On September 7, 1950 at 11 a.m. the defendant was at the cemetery and received a telephone call which the defendant had already told the witness he was expecting. The defendant then said to the witness that the call had been made by Lucy, Iris' sister, who had told the defendant that "Iris had gone with her sweetheart." The defendant departed immediately in his Cadillac automobile. Fournier returned to the cemetery at approximately

3:30 p.m. the same day and ordered Gregorio Fargas, an employee of the cemetery, to dig a hole in tomb No. 4 in order to see if it would leak. Gregorio dug a hole about two square feet and the witness went back to his work. At 11 p.m. on the same day Fournier came in his Cadillac to the house near the cementery in which the witness lived. The defendant gave the latter a little rum and began to read a newspaper. Then Fournier asked the witness for the keys to get into the cemetery as he had a date with a nurse. The witness gave the defendant the keys. Fournier parked his car in front of the house of the witness. The latter could see that there was no woman in the car. The witness went to bed. About an hour or so later Fournier came back to return the keys. The defendant was sweating a little. Fournier told the witness that if the latter got up in the morning before the defendant, to look for a woman's white shoe that the defendant had lost in the cemetery. When the witness arrived at the cemetery at 6:40 the next morning, Fournier was already there. On September 7, when the witness closed the cemetery, the hole dug by Fargas was open; early the following morning, when the witness first saw it, it had already been filled with sand. The defendant told Pedro Andino, another employee of the cemetery, to mix some cement and stones in order to pave the floors of the tombs in parcel F, which included tomb No. 4. When the workmen went to make the cement floor of tomb No. 4, it was already closed and levelled off. Fournier had never before asked him for the keys in order to get into the cemetery with a nurse. One morning while he and the other employees were working in the cemetery, District Attorney Viera Martínez arrived with some detectives and put Fargas and Andino to work digging in tomb No. 4. The first thing they found was the shoe between tombs Nos. 5 and 6. Then they found Iris' body in tomb No. 4. On the morning of September 8 the witness noticed a blood stain on the right rear fender of the Cadillac belonging to Fournier. Subsequently, but before the body was dug up, Fournier told

the witness he did not have to pay Iris anything because she had gone away with a "he man".

Agapito Rosa García, an employee of the cemetery, corroborated the testimony of Juan Ponce López as to the order of Fournier to pave tomb No. 4 on the morning of September 8. He also saw the blood stain on Fournier's car that morning. Fournier left the cemetery that same morning and returned about 9 a.m., bringing with him something wrapped in a cement bag. The defendant himself dug a hole with a shovel between tombs Nos. 5 and 6, threw the package into the hole, and closed the hole. The witness also corroborated Ponce López' testimony that District Attorney Viera and some detectives were present on the morning of October 8, 1950 when Fargas and Andino, digging at the direction of the district attorney between tombs Nos. 5 and 6, found a woman's white shoe with some pieces of a cement bag at the same place where Fournier had dug the hole into which he had thrown the package. The witness also testified that they continued digging and found the body of Iris in tomb No. 4. On a day after September 8, 1950, Fournier was in the office reading a newspaper and he said: "Look, Iris has disappeared and she went away with a 'he man'."

Pedro Andino Villalongo, also employed at the cemetery, testified to the same effect as Ponce López and Rosa García, that tomb No. 4 had been cemented on September 8 at the direction of Fournier. The latter, after digging a hole between tombs Nos. 5 and 6, had buried a package in it. The witness identified the shoe which was in the hole when it was dug up on October 8. Two other employees of the cemetery, Ernesto Santana Alicea and Gregorio Fargas Ayala, corroborated the testimony of the other witnesses as to these episodes.

Two sisters of Iris testified. They identified all the clothes, handbag, jewelry and other objects which were found buried with Iris' body as belonging to the latter. Iris left home at 7 a.m. on September 7, 1950 to go to work and never

returned home again. Three or four days after their sister had disappeared, they went to see Fournier at the cemetery. He was trembling while he talked to them. One sister told him they were afraid the defendant had killed and buried Iris. Fournier denied this accusation. The defendant offered to help find Iris. He said he would make out her check for October and that if Iris was with someone, she would send someone to get her check and in that way they would find out where she was. In the presence of one of the sisters, the district attorney asked the defendant what he knew about the death of his ex-wife. Fournier replied very cynically that was "a $64 question". The district attorney said, "then, win it, you know where she is. Tell us where she is." And the defendant said, "I do not know, if I knew I would have already won it. . ." Fournier told the district attorney in the presence of the sisters that he had seen Iris in a bank in San Juan on the Monday after her disappearance. In their testimony the sisters described the fights Iris and Fournier had during their marriage. Iris obtained a divorce in 1949 from Fournier on the ground of cruelty. Custody of their daughter was awarded to Iris. Fournier was required to pay her $150 a month for support of the child. Before he married Iris, Fournier had three children: two by his first wife, whom he divorced, and a recognized natural child by a lady who came here from continental United States. A complaint filed by Iris in 1949 in the former municipal court prior to the divorce was admitted in evidence. In this complaint, Iris charged Fournier with aggravated assault and battery.

Enrique Ramírez Brau, a newspaperman, testified that at about 11:30 A.M. on October 10, 1950 he and a number of other reporters and press photographers went to a partially constructed house which belonged to Fournier in ward San Antón near St. Just at the invitation of the district attorney. A number of detectives and policemen were also present. The witness identified numerous photographs which were

taken at the time of the exterior and interior of the house and of the defendant acting out the manner in which the latter had killed Iris. The defendant put a plank across the bathtub and said that "there on that plank he had placed Iris...that he had taken off her belt which she had around her waist, he had put it around her neck, and he had strangled her." The defendant added that "...he had picked up the body and with difficulty got it out of the window in order to put it in the trunk of his automobile." Both inside and outside the house, the defendant explained to all those present how he had strangled his ex-wife. The witness identified a number of photographs of these events, including a photograph in which the district attorney was informing the press, the defendant assenting, that Fournier had confessed to the crime of having killed Iris by strangulation.

At this time the question was raised as to the voluntary character of the defendant's confession at San Antón. The jury was withdrawn and Ramírez Brau was examined by the district attorney on his issue. He testified that Fournier was "tranquil", expressed himself in a quiet voice, and spoke normally. His hands were free; he was not handcuffed. His attitude was "correct" and one of "decided cooperation" with the district attorney, the detectives and the newspapermen. The defendant told his story spontaneously and no pressure was exerted on him by anybody to tell his story. He not only confessed voluntarily, but he also spontaneously acted out the manner in which he had gotten the body out of the window. The district attorney called the newspapermen together outside the house and told them, in the presence of Fournier, that the latter had confessed voluntarily, without any pressure having been exerted on him or any offer having been made to him. When the district attorney made this statement, Fournier moved his head in assent. The district attorney said that Fournier had told

him that if the crime had not been solved by December, he would have "declared" it to the authorities on his own initiative.

On cross-examination by counsel for the defendant on the issue of the voluntary nature of the confession by the defendant at San Antón, Ramírez Brau testified that he had seen the defendant on a bed at night in the police station 24 to 36 hours earlier. At that time Fournier told the witness he was at the police station because he had asked the district attorney to send him home or to some other place as he wanted to rest since he was very uncomfortable sitting in the office of the district attorney all the time. The witness asked Fournier for a picture of Iris. The defendant told him to look for the 1945 Central High School yearbook which contained a beautiful picture of Iris. He said that if the district attorney continued to bother him he was going to slap him. The man whom the witness saw first at the police station and later at San Antón were two different persons. The former was a man full of passion; the latter showed no signs of passion at San Antón when he was "describing the scenes" and confessing his crime. On the occasion at the police station, at about 2 a.m., the witness told the defendant that the district attorney was going to order graves dug up because he believed that Iris was buried in the Fournier Cemetery. The defendant answered that the district attorney could order all the 1,800 graves in the cemetery dug up, but he would have to pay $10 for each grave which was dug up. That night the defendant did not tell him any of the facts of this case. However, he confessed at San Antón, agreeing to everything the district attorney said.

Luis Casenave, a press photographer, also testified out of the presence of the jury on the issue of the voluntary character of the oral confession made by the defendant on October 10, 1950 at the partially constructed house belonging to the defendant at San Antón. He testified that he was present when the above-described events took place. The

witness took numerous photographs there which he identified. The "actions" of the defendant were "completely free"; he posed "freely" for pictures, indicating at the request of the district attorney where and how the facts had occurred. The defendant was completely serene and tranquil; no one was disrespectful to him.

On the issue of the voluntariness of the "actions and declaration" of the defendant, the district attorney offered a certified transcript of a statement made in the afternoon of October 10, 1950 at the hearing on a petition for a writ of habeas corpus filed on behalf of the defendant against the district attorney. The statement made by Lic. Rubén Gaztambide Arrillaga, the attorney who represented Fournier at that time, was as follows:

"We wish to announce our protest concerning the fact that we have not been permitted to see the defendant for more than 80 hours since he was detained. Fortunately, the defendant himself has stated to us that at all times he was treated with all the necessary respect by district attorney Viera Martínez and that at no time was he forced to say or do absolutely anything against himself and that his statement or confession was wholly voluntary, that the only thing he requested of District Attorney Viera was to see his attorney and District Attorney Viera told him that as an investigation was involved the presence of his attorney was not necessary.

"We, of course, understand the contrary to be the case and simply limit ourselves to protesting that prior to this date we were not permitted to talk to him; but reaffirming that his statement or confession was absolutely voluntary and in spite of our protest as to the expressed fact, we congratulate the district attorney for the decent and clean manner in which he conducted this investigation.

"We also wish to state that the attorneys for the defense desist at this time from the petition for habeas corpus and request, if the information has already been filed, that bond be fixed."

Counsel for the defendant objected to the introduction in evidence of the certified transcript of this statement of

Lic. Gaztambide. He gave no grounds therefor. When the trial court said to him, "Do you wish to discuss it?", he replied "No, sir." It was admitted solely on the issue of the voluntariness of the confession.

The government offered no further testimony on the preliminary issue before the court as to the voluntary character of the oral confession at San Antón. Still out of the presence of the jury, the defendant thereupon put the district attorney, Ángel Viera Martínez, on the witness stand in an effort to prove on the preliminary hearing of this issue that the confession in question had been involuntary. On October 7, 1950 the witness had "to engage simultaneously in various activities in different places, San Antón of Carolina, Fournier Cemetery . . ." and therefore does not know at what time Fournier "was detained for investigation" on October 7, 1950; but he can say that it was sometime in the morning. (Subsequently, it was stipulated that the defendant was "detained for investigation" and brought to the office of the district attorney at 8:00 a.m. on October 7.) Fournier made a sworn statement to the witness, beginning at 10 p.m. on October 9, 1950 and terminating at approximately 4:00 a.m. on October 10. The witness has two sworn statements in writing which were made by the defendant during the night of October 9–10, 1950; the defendant also made other statements orally during the same night. After the defendant had made the said written and oral statements to the witness during the night of October 9–10, the latter took the defendant to San Antón "to continue the questioning on the ground and with things in view . . . with respect to all the things physically seen." From the time the defendant was "detained" on the morning of October 7 to date the defendant "has not regained his liberty." This included the time during which he made the oral statements at San Antón to which Ramírez Brau has testified. The defendant was not permitted to see an attorney during the

approximately 80 hours he was detained. The defendant saw and conferred in the office of the district attorney with his attorney Lic. Gaztambide and a relative—his aunt—for the first time on his return from San Antón on October 10 and immediately prior to the hearing on the petition for habeas corpus which was held on the same day. This attorney had been to see the district attorney on October 9 to bring clothes to the defendant and to ask for him; the district attorney told the attorney that the defendant was very well. Apart from the fact that the defendant was asked by others how he felt and if he wanted anything to eat or drink, the defendant was not questioned by anyone but the witness as to the facts of the case. The defendant remained incommunicado from the morning of October 7 until he made his statements on October 10 at San Antón. The defendant was taken to the Fournier Cemetery on October 8 at 2:00 p.m. There were more than 10 people at San Antón, including newspapermen and photographers. A "storm of flashlight pictures" was taken there.

District Attorney Viera then "in the nature of cross-examination of himself" testified as follows: The defendant was detained on the morning of October 7, 1950 for purposes of investigation. He did not intervene directly in the detention because the work of the investigation had been distributed in order to be done simultaneously in its first stages by different people at different places. He had to go to the funeral establishment, to the house at San Antón, to the cemetery and to other places. From the time he was originally detained until the defendant made his statement, he did not have counsel because in the witness' opinion he had no right to such counsel. It was not until the night of October 9 and the early morning hours of October 10 that he finally questioned the defendant in connection with the disappearance and death of Iris. When he went to the cemetery on October 7, he gathered together all the people who in his opinion might know something about the case in order

to question them. While he was at the cemetery, there was a heavy rain. He had to return to the office of the district attorney with all the witnesses, which delayed the investigation. During this time the defendant was in the office of the district attorney and had not gotten wet, as had all the others. It was necessary to provide space for all the witnesses and to permit some of them to change their clothes. It was therefore not possible to begin the questioning until that night. The defendant meanwhile remained tranquilly in the office of the district attorney in an armchair with newspapers and text books at his disposal. Pursuant to the orders of the witness, the defendant's wishes for food, drink and sleep were granted. He questioned witnesses throughout the night of October 7 until the morning of October 8 without having eaten or slept, whereas the defendant had eaten and slept during that time. Once he had oriented himself with the testimony of these witnesses, on October 8 he returned to the Fournier Cemetery in order to dig up the body, the personal belongings and the shoe of Iris. This work at the cemetery took a long time. The exhumation of the body had to be done with great care in order not to damage it. All this work had to be done in spite of the terrible smell emanating from the body because of the length of time it had been buried. While all this was being done, he had ordered that the defendant be taken to sleep whenever he wanted in a bed with a mattress which had been prepared in the police station, where he was given the kind of food he wanted at the hours he wished. An electric fan was furnished to the defendant in order to keep cool. The defendant was always highly tranquil during this period. He had to question additional witnesses as a result of what he had uncovered by his investigation to date in order to begin questioning the defendant. It was not until the night of October 9 that he was ready to question the latter. His questioning of the defendant continued until daybreak of October 10. This was one of the most time-consuming and

difficult investigations he has ever conducted because he did not even know where the "body of the crime" was. It took him many hours to discover this. The defendant at no time protested about anything or demanded anything. Rather the defendant was always disposed to cooperate. After the night of questioning, he told the defendant that they had to go to the country. The latter replied, "when you wish". The district attorney indicated that he was going to leave it for tomorrow, but the defendant said, "No, when you wish". On October 10 they went to San Antón and at that place, in the presence of representatives of the press whom the witness invited in order that they might have information, the defendant explained the manner in which he had committed the crime and posed for photographs of the different stages of the crime as he had committed it. When they returned from the cemetery they had some coconut water on the road. The defendant told him he wanted to see a relative. The witness permitted him to see his aunt and to talk to her in his presence in his office. The defendant also saw his attorney, Lic. Gaztambide Arrillaga, and talked to him.

The parties at that point submitted to the trial court the issue of the voluntariness of the oral confession made at San Antón to which Ramírez Brau and Casenave had testified. The trial court ruled that it could not hold as a matter of law that this confession was involuntary. It therefore directed the parties to submit that issue to the jury. This required repetition of the testimony as to voluntariness in the presence of the jury. Accordingly, the jury was brought back to the courtroom and Ramírez Brau and Casenave testified again, in the presence of the jury, both as to the voluntary character of the confession at San Antón and as to the details thereof.

Angel Luis Torres, a member of the secret police attached to the office of the district attorney, testified that he was a member of the group of newspapermen and detectives who accompanied the district attorney and Fournier on

their visit to the latter's house in San Antón on October 10, 1950 at approximately 11 a.m. The witness found some fibers of a belt in a clod of earth within a drainpipe in the bathroom of the house. The clod of earth with the fibers was not visible but he looked for them in the drainpipe because Fournier told him that he had thrown the fibers into the pipe the day he killed Iris and that they were a part of the belt with which he had killed her. While Fournier was saying this, he was in a "tranquil attitude." No one forced the defendant to say that the fibers were inside the drainpipe. He did it voluntarily because he wanted to cooperate with the authorities. Fournier stated in the presence of everybody there that he picked up the body, lifted it through a window, put it in the trunk of his automobile, closed it and departed.

At this point the witness began to testify as to what Fournier had said at the district attorney's office on the previous night in his presence. The jury was withdrawn. In its absence it was stipulated by the parties that the witness would be permitted to testify as to the various statements made by the defendant, but that the issue of their voluntariness would be submitted to the jury; that the jury would determine this issue on the basis of (1) the testimony it had already heard as to the voluntariness of the confessions of the defendant, (2) the portion of the testimony on this issue heard by the court but not by the jury which would be read to the jury instead of being repeated by the witnesses, and (3) the examination and cross-examination of the present witness. The jury then returned to the courtroom and the witness testified that at the district attorney's office on the previous night in the presence of the witness the defendant stated that on September 7, 1950 he went to the home of his sweetheart and took her to work with Iris' body in the trunk of the car. Subsequently, he proceeded to his own home and had lunch. After lunch, he went to the Fournier Cemetery at about 3 p.m. He left the cemetery and went to get his

sweetheart whom he took home from work. He went to his own home, took a bath, and visited his sweetheart that night. At about 11 p.m. he went to the Fournier Cemetery.[1]

On cross-examination, Torres testified that he saw the defendant on Saturday, October 7, 1950 when he was brought to the office of the district attorney for questioning. The defendant was told to wait until the district attorney had time to question him. While the latter was making his investigation, the defendant stayed in the office of district attorney Mieres Calimano. The defendant conversed with everybody and read detective stories, but he was not permitted to talk to any attorney or relatives "because he was in the process of investigation." The defendant was kept in the said office all day Saturday. He was taken early Saturday night to the police station where he slept in a bed which had been prepared for him. On Sunday morning a policeman brought the defendant back to the office of district attorney Mieres, where he remained all day Sunday. He was kept under guard and not permitted to communicate with anybody except police officials or attachés of the district attorney's office. On Sunday night the defendant was taken to the police station, still under guard, and permitted to sleep there. On Monday morning he was brought back to the office of district attorney Mieres. He was kept incommunicado—that is, without being able to interview an attorney or relatives—throughout Monday. On Monday night about 7:30 p.m. District Attorney Viera began to question the defendant. Nobody had questioned the defendant up to that time, although various detectives had asked him about his ex-wife and he said that she had disappeared. District Attorney Viera questioned the defendant in the presence of Lieut. Soto, a stenographer and the witness until about 4:30

---

[1] We note in passing that during cross-examination the witness apparently testified that Fournier also made these same statements at San Antón. However, in view of the result we hereinafter reach on the issue of voluntariness, it is immaterial where Torres heard the defendant make these statements.

a.m. on Tuesday. No one else questioned the defendant during this period. After the district attorney had finished his questioning, they sent for some coffee which all of them, including the defendant, drank. Subsequently, they decided to go, at the request of the defendant, to San Antón. This was not done at the request of the district attorney; it was done at the request of the defendant, who wanted them to go there. The statement the defendant made during the night was taken stenographically. It was typed by the stenographer and was signed by the defendant when they returned from San Antón. When the defendant was confessing at San Antón, he was tranquil and posed for the photographers. The district attorney asked the defendant at San Antón to explain how he had killed his ex-wife. The defendant took the plank, put it across the bathtub, and explained how he strangled his ex-wife. The defendant explained that he had hit Iris, she became unconscious, and for this reason he was able to place her on the plank and strangle her. He said he seized her by the neck, made a tourniquet with a nail, and strangled her with the belt. He took her out through a window, put her in the trunk, and left. The defendant went voluntarily to San Antón. He took them; they did not know where it was. All those present went to San Antón at the defendant's invitation. He took them there to explain the manner and place where he had killed his ex-wife. The witness cannot say at exactly what time in the morning they went to San Antón. When they returned, the defendant was taken to court for the hearing on the petition for habeas corpus at 2 p.m. He had already signed his sworn statement. On Sunday, October 8, after Iris' body was found buried clandestinely in a tomb in the Fournier Cemetery, the district attorney ordered the defendant to be brought to the cemetery and the defendant was taken during the afternoon to the said tomb. There were newspapermen and press photographers present. The district attorney asked the defendant "whose body is that"? The defendant "was looking

at the grave, he was nervous and upset". Each time he was asked to identify the body, he trembled and looked toward the grave.

On redirect examination the witness testified that Fournier had told him that he had started a premedical course at college, that he had taken and completed a course in embalming, and that he had also had instruction in jiu-jitsu. The objection of counsel for the defendant that these matters were covered in a written statement of the defendant was overruled. Two written statements which were made by the defendant but which had not yet been introduced in evidence were furnished by the district attorney to counsel for the defendant at this time. On redirect examination, the witness also described in detail all the activities already noted in the testimony of district attorney Viera which, according to the latter and this witness, made it necessary to postpone the questioning of the defendant until the night of October 9-10. He also stated that nobody had any sleep during the days and nights involved except Fournier.

The district attorney then offered in evidence a 23-page sworn statement which was made by the defendant before the district attorney on the night of October 9-10, 1950, taken stenographically, and subsequently transcribed by the stenographer and signed by the defendant. Counsel for the defendant objected on the ground that it was made involuntarily. It was accepted in evidence, subject to a submission thereof to the jury on the issue of its voluntariness, and marked as Exhibit 48. The defense asked that the district attorney be required to offer the other sworn statement made by the defendant on the same night, consisting of 84 pages. The district attorney refused to offer the latter, but announced that he would not oppose its admission if it were offered by the defendant.

The signed and sworn statement of the defendant, embodied in Exhibit 48, which was then read to the jury, may be summarized as follows: The district attorney stated that

he accuses the defendant of the crime of murder in the first degree in that he killed Iris on September 7, 1950. He advised the defendant he had a right not to testify and anything he said might be used against him. [2] The defendant then told the history of his unsuccessful marriage to Iris, including the opposition of his parents thereto and the threat made by his mother to disinherit him if he married her. After the divorce Iris kept telephoning him, insisting that she had something to settle with him and expressing her determination to destroy any happiness he might have in the future. She blamed their separation on his mother and stated that she would make his mother suffer by making him unhappy. As she had indicated two days previously, Iris phoned him on September 7 at 10:30 a.m. at the cemetery. She said she had to talk to him on a matter very important to his future. She indicated that their daughter had had her birthday a few days ago and asked him to bring some money for a gift to the office where she worked. When he arrived at the office, Iris came down to the street. He offered her the money, but she got in his Cadillac automobile, saying that she had to settle a matter with him that same day. He drove to his partly-constructed house at San Antón. During the trip Iris had been taking off her clothes, piece by piece. She preceded him into the house, going through the window on the right side of the house directly into the bathroom. When he entered the house in the same manner, he found Iris completely unclothed. She had around her throat the silver cloth belt which she had been wearing. She tightened the two ends of the belt around her throat, telling the defendant that she wanted him again for revenge on his mother. She said that if he did not come back to her she would commit suicide. Iris then proceeded to lie down provocatively on a plank placed across the bathtub. While laughing madly, she continued to press on her

---

[2] See footnote 21, *infra*.

throat with the belt. Completely unnerved by her conduct and talk, he jumped on her, seized her hands and pulled them down to her sides. The belt remained in one of his hands. "I threw myself on her and I grabbed with one hand the ends of the belt, I don't know what I did, but I found myself twisting her neck, the neck of Iris Nereida Hernández, the belt and with the nail in my hand, as if it were a tourniquet, but I cannot say if I seized the nail or if it was already there or if I seized the belt and I made a knot, as I grabbed the two ends with my two hands. What is true is that I closed my eyes and I found myself with the nail as a tourniquet and the belt tied around the neck of Iris Nereida Hernández. Her hands stayed at her sides when I let the ends of the belt go with the nail twisting the belt and there Iris Nereida Hernández Matos remained. I did not notice if at that moment she was already dead and I proceeded at once to dress her as she was completely nude. Immediately afterwards, desperate and without being able to reason as to what had occurred, I went to the automobile in the same way we had entered, the window, and leaving her resting on the window frame, I opened the trunk of my automobile and put her inside and immediately closed it. When I got into the automobile, I found on the seat her handbag and a box of Kleenex which I immediately put in the trunk with her." He took some fibers of the belt off the floor and threw them into the drainpipe of the bathroom. He dressed Iris with her brassiere, panties, two half slips, and her dress. He used a colored silk scarf to cover her face because her expression was not very agreeable. This occurred at 12:45 p.m. and the body remained in the trunk of his car until 11:45 p.m. He returned to the cemetery after lunch and at approximately 4 p.m. ordered Gregorio Fargas to dig a hole 27 inches deep. He told Fargas he wanted to determine if water would leak into the tomb. He went home, bathed, changed his clothes and at 10:30 p.m.

went to the house of Juan Ponce López, caretaker of the cemetery. He borrowed the keys to the cemetery from Ponce, telling him that he wanted to go in the cemetery with a girl. He had an ounce of rum with Ponce at that time. He drove into the cemetery, took the body out of the trunk, put it in the hole in tomb No. 4 and covered the hole with the sand which had been dug out of the hole and had been placed at the head of the tomb. He did this at approximately 11:45 p.m. After putting the body in tomb No. 4 he returned to the automobile, got the handbag and the box of Kleenex and put them alongside the head of the body. He noticed that a shoe was missing from the body. In putting pressure on the body when he took it out of the trunk some gases came out through the nose and mouth. He therefore covered the face with part of the dress and scarf in order to avoid any further escape of gas. In everything that he did or that he ordered to be done on September 7 he was acting like an automaton with a complete lack of control over himself. He found the missing shoe the following morning when he went to look for it at the house in San Antón. He got up at 6 o'clock and arrived at the cemetery at 6:30 the next morning. He went to look for the shoe at 9 a.m. and returned with it at approximately 10:30 a.m. He has not told these facts to anyone and this is the first time he is telling them. People had been asking him questions for various days about the disappearance of Iris and he had avoided giving explanations about it for fear of confessing the truth. He tried to confess to a priest but did not do so, although he has wanted to do so up to this time. He had decided that if the facts had not been ascertained before December he would notify the authorities. Nobody had knowledge of the commission of this crime before it took place, "not even he himself". Everything that he has said is the truth and all the truth. This is his spontaneous, voluntary statement, made freely without any promise, coercion, threat or without anyone

having deprived him of his freedom of thought in order to set forth all the details. He accepts the responsibility that the accomplished fact carries with it.

This completed the presentation of testimony by the government. Counsel for the defendant thereupon addressed the court and jury as follows: "The theory of the defendant is the following: The defendant has pleaded not guilty of the crime with which he is expressly charged by the district attorney, that is, murder in the first degree. The defendant admits that the death of Iris Nereida Hernández Matos occurred in the manner described in the statement presented by the district attorney, made on October 10, 1950 and offered by the government as proof of the People and marked Exhibit 48, which you have just heard. We also contend that the defendant, in acting as he acted and in the manner expressed in the said statement, did so in a state of anger, caused by passion. When we prove the facts which we have announced, at the appropriate time, we shall request the court to instruct you on the verdict applicable to the facts and in accordance with the proof of both the People and the defense." At this point the district attorney said: "What verdict did you say you were going to request"? Lic. Sánchez Castaño, who had stated the theory of the defense, said: "That is the theory." Lic. Ochoteco, another attorney for the defendant, added: "When we produce our proof, we shall ask for it."

In support of his theory the defendant offered testimony showing that he had relatives who had been hospitalized in mental institutions, suffering from dementia praecox, paranoid type. This mental disease, according to the medical experts who testified for defendant, consisted of personality disturbances which affected the emotions and intellect, caused persecution manias, emotional instability, poor judgment, delusions of grandeur, and the belief that one is not ill.

The 84-page sworn statement of the defendant was then admitted in evidence as Exhibit A of the defendant. This sworn but unsigned statement was made by the defendant on the night of October 9, 1950 before he made the statement admitted as Exhibit 48 for the government. In Exhibit A the defendant said he was 23 years and 8 months old. He was questioned extensively by the district attorney on a number of seemingly irrelevant questions. He described his trips to the States and his educational experiences. He told of having assaulted an Army Major in a public place, knocking out four of his teeth, because he resented a remark made by the Major about Puerto Ricans. He described his tastes in sports and literature, including the reading of stories about crime. He said his parents had opposed his marriage to Iris. He admitted he had struck both his first wife and Iris on two occasions. He described in detail his courtship of his first wife, of the lady who was the mother of his acknowledged natural child, and of Iris and how both of his marriages had terminated in divorce. The district attorney engaged him in a lengthy discussion concerning religion and many other matters, gradually working around to the subject of Iris' death. The district attorney reminded the defendant that he had seen the body of Iris in tomb No. 4. He showed Fournier a photograph and asked him if he could identify the nail and belt around the neck of the body. This statement closed with the following series of questions and answers: "Q. Why does the mouth of Iris Nereida appear covered with a handkerchief? A. I can not tell you. Q. And it appears with the belt tied around her neck by you? A. No, sir. Q. You have tied a nail to it. A. Why does it have to be me? Q. Because it can not be anyone but you, because the dead do not fall into graves, appear with a cord tied around the neck, with a belt, having carried her to the trunk of the car, having asked Juan Ponce for the keys. A. Now you are making direct insinuations. Q. I am accusing you. A. And with all my rights, if I have them, I am not

obliged to answer those questions. Q. If you believe that you would be prejudiced you do not have any right to answer? A. I do not prejudice myself but I refuse to answer. Q. Why do you refuse to answer? A. Because it is a direct accusation. Q. Why did you go to Juan Ponce to look for the keys at night? A. I have nothing more. Now all your questions are accusations of me. Q. I am asking you. A. I have nothing more to answer, if you believe you have a basis for an accusation against me...Q. Are you prejudicing yourself? A. I am not prejudicing myself. Q. I ask if you are incriminating yourself? A. I am not incriminating myself. Q. If you are not prejudicing yourself at all you are going to answer me. A. Now I do not want to answer because this is now a direct accusation. Q. You are not going to answer any questions? A. Of any sort. Q. In no manner, not even inviting it with some answer? A. It depends on what you want. Q. About what other thing is it going to be? A. I believe that now this is a direct accusation, what is lacking is that you accuse me directly. Q. If you are not incriminating yourself in anything. A. That is what you believe but it may be prejudicial for me. Q. You determine that. A. And you. Q. You believe it is prejudicial? A. I do not believe it is prejudicial. Q. Do you have in mind telling the district attorney to go to hell? A. Now you are acting like a district attorney. Q. I ask you why you went to Juan Ponce looking for the key? A. I do not have to answer anything more. Q. Why does it incriminate you? A. I am not incriminating myself. Q. Why did you order Gregorio Fargas to make a hole? A. I do not have to answer. Now I shall remain silent until it is time to say good night. Q. Why until it is time to say good night, because it prejudices you? A. Because I am not going to speak any more. Q. You have to answer my questions one by one. A. I came to answer your questions voluntarily contrary to opinions of lawyers who have always told me everything and I believe I have a right not to answer any more. Q. Did you go to your cemetery

that night of September 7, 1950, answer me. A. From now on I do not have to answer. Q. Does it prejudice you? A. It does not prejudice me at all. Q. It does not incriminate you? A. It does not incriminate me. Q. You have the obligation to answer. A. I am not going to answer anything any more. Q. Tell me why at about 9:00 o'clock on the night of September 8 you were carrying a package about this long (the district attorney indicates the size) and you threw it between tombs 5 and 6 and with a shovel which you asked Gregorio Fargas for you buried that package you were carrying? District Attorney: Two minutes have gone by and you do not answer. Q. Tell me why you buried the white shoe, one of the shoes which Iris Nereida was wearing, between tombs 5 and 6? District Attorney: Two minutes have gone by and you do not answer. Q. Tell me why you ordered Gregorio Fargas to make a deeper hole in tomb No. 4 and you asserted it was to see if it would leak? District Attorney: Two minutes have gone by and you do not answer. Q. Tell me, why you asked Gregorio Fargas to leave that hole open in tomb No. 4? District Attorney: Time passes and you likewise do not answer. Q. Tell me, why Agapito Rosa said: 'There they have just buried a thing of embalming.' District Attorney: Again, you do not answer. Q. Tell me why you went at night to Juan Ponce and had a drink with him and told him 'lend me the keys to the cemetery, I might go in the cemetery with a nurse.' A. ...District Attorney: You do not answer. You likewise do not want to say why you do not answer. Q. Tell me why before 7 o'clock in the morning a long time before, you were already in front of the gate of the cemetery waiting for them to open the door? A. ...District Attorney: You do not answer and you do not wish to say why you do not answer. Q. Tell me why there was a bloodstain on the right side of your car, past the door, on that same day, September 8, 1950? District Attorney: Again you do not answer. Q. Tell me why on that other day, September 8, 1950, the hole you ordered Gregorio Fargas to

open to see if it leaked, early in the morning, was covered with sand and a piece of cloth with blood was in it? District Attorney: You do not answer and you do not want to do so. Q. Tell me why that floor of sand in tomb No. 4 where you had ordered a hole to be made the day before, stayed open and why in the morning you closed it or made a floor of concrete on it? District Attorney: You do not answer because you are guilty of the murder of Iris Nereida Hernández. You do not answer because you strangled Iris Nereida. A. You are the one who is making that conclusion. Q. Did you strangle Iris Nereida Hernández? A. No, sir. Q. Your ex-wife. A. No, sir. Q. And you buried her in the manner you saw her? A. No, sir. Q. ...believing you were going to commit the perfect crime. A. You have insinuated that the perfect crime does not exist. Q. Do you answer or don't you answer? A. I answer no, that it is not as you say. Q. Why did you order that hole made in tomb No. 4, below the bottom, about 2-½ feet, why? A. Because you said that it was to see if it leaked. Q. You said to Gregorio Fargas that the body of Iris Nereida Hernández was buried there? A. What I say is no. Q. You answered? Why did a bloodstain appear on your car? A. I do not know that. Q. On September 8, 1950 there was a bloodstain on the right rear part of your car? A. I did not know that. Q. You also did not know that on September 8, 1950 about 9 o'clock in the morning you buried a shoe? District Attorney: You do not answer. Q. With straps in the form of a sandal, with a heel. Do you want me to show you the nail that you used to strangle Iris Nereida Hernández? District Attorney: You do not answer. Q. Do you want me to show you the belt she wore on September 7, 1950 which you tied around her neck, and with the nail inserted in the belt, you twisted it until you strangled her, breaking her larynx? District Attorney: Minutes pass and you do not answer. Q. Do you want me to show you the handkerchief that Iris Nereida was using on September 7, 1950 and which you used in order to cover her

mouth and nose so that she could not scream and then you strangled her? District Attorney: You do not answer and time passes. Q. Do you want me to bring here the other shoe which she was wearing when you threw it into the tomb of your own cemetery, the other shoe which made a pair of shoes with the shoe you buried about 9 o'clock in the morning between tombs 5 and 6? District Attorney: You do not answer. Q. Do you want me also to bring here a bracelet she was wearing; do you want me also to bring a box of Kleenex that she had on September 7, 1950 because she had the grippe, and which you put at the side of her head, near her neck, so that it would not remain outside, after you strangled her and buried her in that tomb No. 4? District Attorney: You do not answer. Q. Do you also want me to bring the handbag that she was using, that you placed along-side the box of Kleenex, after you strangled her and buried her face downward in your own cemetery? District Attorney: You do not answer; and you do not answer because you are guilty of the murder of Iris Nereida Hernández by strangulation. A. Those are your words. Q. Why don't you answer, answer me then if they are my words; why did you order the floors of that tomb to be made at that moment on September 8, 1950? A. That is the daily work, making the floors. Q. You knew there was a body there. Look and see if it was customary to make a hole in the bottom of the tomb to see if it really leaked or if you are guilty of murder by strangulation of Iris Nereida Hernández whom you buried in a tomb of your own cemetery and kept quiet because you know the place and you know that it does not leak there. I am going to bring you the nail you used and you are going to tell me where you found it. Are you going to tell me? A. I have nothing more to say. Q. You have nothing more to say, why? A. I have said everything. Q. You have said everything? A. I have left it. I have my rights not to answer. Q. Am I accusing you? A. Yes, they are accusations. Q. Of the murder of Iris Nereida Hernández, who

was your ex-wife? A. You are accusing me and I do not have the words with which to answer you. Q. Answer me. A. It has to be a lawyer: Q. You do not have the right to be assisted by a lawyer on this occasion. Answer me, if you went to the house of Juan Ponce to look for the key, for that you do not have to have a lawyer. Answer me now if you took some drinks with Juan Ponce. A. You are accusing me. Q. In order to answer me about the key you do not have to tell me . . . District Attorney: You do not answer. Q. What color is the belt she had around her neck? District Attorney: You do not answer."

The remaining proof offered by the defendant consisted of testimony by psychiatrists. They were asked hypothetical questions about the defendant's mental and emotional condition based on the history of mental illness on his maternal side and his conduct as revealed by the facts set forth in Exhibits 48 and A. They replied that he had less emotional resistance than a normal person and was more easily subject to emotional explosions and outbursts. None of these physicians had examined the defendant and all of them said he was sane.

## II

*Was written confession—Exhibit 48—inadmissible in evidence on sole ground it was made while defendant was under illegal detention?*

The defendant contends that even if his written confession—Exhibit 48 of the People—was voluntary, it should not have been admitted in evidence because it was made during illegal detention.[3] The defendant relies here on *McNabb* v. *United States*, 318 U. S. 332; *United States* v. *Mitchell*, 322 U. S. 65; and *Upshaw* v. *United States*, 335 U. S. 410. In these cases the Supreme Court held that even if a confession is voluntary, it may not be admitted in evi-

---

[3] For the reasons hereinafter stated in Part III (b), it is clear that the defendant made the written confession while he was being illegally detained.

dence if it was made during illegal detention in violation of a Federal statute and rule providing that an arrested person shall be taken "without unnecessary delay" before the nearest committing magistrate. But the cases in question were not decided on constitutional grounds; they state a judicially created rule of evidence for the Federal courts, known as the *McNabb* rule. We are therefore free to fashion our own rule of evidence on this question. *Stein* v. *New York*, 346 U. S. 156, 187–8; *Gallegos* v. *Nebraska*, 342 U. S. 55, 63–4. In fact, almost all the state courts which have considered the question have refused to follow the *McNabb* rule. Annotations, 19 A.L.R. 2d 1331, 1337 *et seq.;* 97 L. ed. 1555, 1557; 96 L. ed. 57, 58, footnotes 11–12; Wicker, *Some Developments in the Law Concerning Confessions*, 5 Vand. L. Rev. 507, 515, footnote 28; Allen, *Due Process and State Criminal Procedures: Another Look*, 48 N.W.U. L. Rev. 16, 34; cases cited in *Upshaw* v. *United States, supra,* dissenting opinion, pp. 434–5, footnote 29.[4]

In examining the question of whether we should adopt the *McNabb* doctrine as a local rule of evidence, it is important to note that our law with reference to committing magistrates is unique. Prior to the effective date of our Constitution—July 25, 1952—in Puerto Rico district attorneys, as well as judges, were magistrates with the power to issue a warrant of arrest, to fix the amount of bail, and to admit the accused to bail. Sections 12, 13, 44 (*a*), 97, 99 Code of Criminal Procedure, 1935 ed. Prosecutions originated in the former district court by informations filed by the district attorney after a finding of probable cause by the latter based upon testimony sworn to before him or before an examining magistrate. Sections 3, 72, 98–100, Code of Criminal Procedure; *Jiménez* v. *González, Warden,* 71

---

[4] The *McNabb* rule is still a creature of case law even for the Federal Courts. It was inserted in the first draft of the Federal Rules of Criminal Procedure but was eliminated before the Rules were adopted. Dession, *The New Federal Rules of Criminal Procedure*, 55 Yale L.J. 694, 707, footnote 48; Orfield, *Criminal Procedure from Arrest to Appeal*, p. 65.

P.R.R. 110. Under Article II, § 10, par. 3 of the Constitution and the statutes implementing it district attorneys were deprived of their power to issue warrants of arrest and to fix bail. A district attorney may still subpoena witnesses, take their testimony, and file informations based thereon; but a warrant of arrest may now be issued only by a judge after a finding of probable cause by the latter. *The People of Puerto Rico* v. *Superior Court*, 75 P.R.R. 501; *People* v. *Quiñones*, 76 P.R.R. 894; Act No. 22, Laws of Puerto Rico, 1952, Special Sessions, amending § § 13, 44*a* and 100 of the Code of Criminal Procedure. However, to this day no formal hearing before the judge is necessary in order for him to issue a warrant of arrest; he may do so on the basis of testimony previously sworn to before the district attorney or any other authorized official. *People of Puerto Rico* v. *Superior Court, supra; Guadalupe* v. *Bravo, Warden*, 71 P.R.R. 913, 920.

As the district attorney prior to 1952 exercised powers as a magistrate in that he issued warrants of arrest and fixed bail, it is obvious that § 44 of the Code of Criminal Procedure, as copied from California, did not at that time fit completely into our system and played only a limited role here.[5] That is to say, there was no need to take a defendant before a committing magistrate other than the district attorney for a preliminary hearing when the district attorney himself was investigating the particular case and was empowered to perform all the functions required of a magistrate, including the determination of probable cause, the issuance of a warrant of arrest, and the fixing of bail. *People* v. *Carmona*, 67 P.R.R. 266; *People* v. *Montes*, 64 P.R.R. 306; *People* v. *Travieso*, 60 P.R.R. 518. Today § 44 plays a somewhat larger role as only a judge may issue

---

[5] Section 44 reads as follows: "The defendant must in all cases be taken before a justice of the peace without unnecessary delay for examination, and any attorney at law entitled to practice in courts of Puerto Rico, may at the request of the prisoner after such arrest, visit the person so arrested."

a warrant of arrest and fix bail after he finds probable cause. However, even under our Constitution § 44 is not so important as it is in continental United States in view of the fact that even today no preliminary hearing as such before the magistrate is required; the latter, as we have seen, may issue a warrant of arrest on testimony sworn to before the district attorney without ever seeing the witnesses or the defendant.

We thus see that when this case occurred in 1950, no substantial purpose would have been served by taking the defendant before a committing magistrate "without unnecessary delay", as required by § 44 of the Code of Criminal Procedure. The district attorney, who was "detaining" the defendant, was himself a committing magistrate, empowered not only to examine witnesses and to file an information but also to issue a warrant and to fix bail. The purpose behind the Federal rule—to force the prosecuting authorities to bring the defendant promptly before a committing magistrate—could therefore not be accomplished effectively under our old system. In the same way, although a district attorney no longer has the power to issue a warrant and to fix bail, he may still subpoena witnesses, take their sworn testimony, and submit the latter to a judge who issues a warrant on the basis of the testimony before the district attorney without holding a hearing at which the witnesses and the defendant are present. Today a district attorney cannot "detain" a defendant unduly and he must take a prompt request to a judge for a warrant of arrest on the basis of sworn testimony; but this does not involve taking the defendant before the judge. It follows, that, for present purposes, § 44 even today under our system cannot accomplish the objective of forcing an arresting official to take a defendant before a judge "without unnecessary delay".

The short of it is that § 44 of the Code of Criminal Procedure, when read in the light of other pertinent provisions of the same Code, does not necessarily require the defendant

to be brought personally before a committing magistrate. There is therefore no basis for adopting as a local rule of evidence the *McNabb* rule that failure to bring the defendant before a committing magistrate without unnecessary delay makes a confession given during such delay inadmissible even though it is a voluntary confession. In addition, we agree with the view that the law of evidence should not be used as a device to punish officials for their failure to take the defendant before a committing magistrate "without unnecessary delay". Wicker, *supra*, p. 515; Maguire, *Evidence, Common Sense and Common Law*, p. 123. Even in the Federal system, the Supreme Court has said that "...the *McNabb* rule was not intended as a penalty or sanction for violation of... [the] commitment statute." *United States v. Carignan*, 342 U. S. 36, 42.

We hereinafter hold in Part III (*b*) that illegal detention is one of the facts to be weighed in determining whether a confession was coerced. But the practice of illegal detention must be stamped out by means other than permitting the guilty to escape punishment despite the fact that they have voluntarily confessed their guilt. The decisive point is the voluntariness of the confession, not the illegality of the detention. *United States v. Carignan*, *supra*, p. 45. In view of the foregoing, we refuse to adopt in this jurisdiction the *McNabb* rule that even if a confession is voluntary it is inadmissible in evidence solely because it was made during illegal detention.

## III

*Was written confession—Exhibit 48—inadmissible in evidence on ground it was obtained by psychological coercion in violation of due process of law?*

(a) *Respective functions of judge and jury on issue of admissibility of confession when voluntariness is brought into question.*

██ "The use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental —is forbidden by [the due process clause of] the Fourteenth Amendment." *Leyra v. Denno*, 347 U.S. 556, 98 L. ed. 631, 632-3, and cases cited in footnote 3; *Watts v. Indiana*, 338 U. S. 49, and cases cited in footnote 3; *Stein v. New York*, *supra*, and cases cited; *Batalla v. District Court*, 74 P.R.R. 266, 283-4, footnotes 4 and 5, and cases cited therein.[6] In this case the defendant contends that Exhibit 48 of the People was improperly admitted in evidence because it was a confession obtained from him by psychological coercion in violation of due process of law. But in order to bring this contention into proper focus, it is necessary to delineate the respective functions of the judge and the jury when the question of the voluntariness of a confession arises.

██ First—In this jurisdiction the trial court must

---

[6] When this case arose, the problem herein was governed by the due process clauses of the Organic Act and of the Fifth Amendment. *Ballester Hermanos v. Tax Court*, 66 P.R.R. 531, 534, footnote 2, reversed on other grounds, 162 F.2d 805 (C.A. 1, 1947). As to the situation today, see *Mora v. Mejías* 206 F.2d 377 (C.A. 1, 1953) holding that Federal due process continues to apply in Puerto Rico.

In *Leyra v. Denno*, *supra*, 98 L. ed. at 633, footnote 3, the opinion states: "Some members of the Court reach this conclusion [that coerced confessions cannot be admitted in evidence in state criminal trials] because of their belief that the Fourteenth Amendment makes applicable to the states the Fifth Amendment's ban against compulsory self-incrimination." However, the majority of the Supreme Court are of a contrary view: They have held that only the due process clause of the Fourteenth Amendment applies in such cases. See *Rochin v. California*, 342 U.S. 165, 173, footnote 6; *Batalla v. District Court*, *supra*; 60 Yale L. J. 1228, footnote 3; Morgan, *Basic Problems of Evidence*, Vol. I, pp. 129-31. Prior to 1952— when this case was tried—the Organic Act contained a clause against compulsory self-incrimination. We need not stop to determine what effect, if any, it had on the issue of voluntariness of a confession. *Cf. United States v. Carignan*, *supra*, 41; *Stein v. New York*, *supra*, 190, footnote 35; Emerson and Haber, *Political and Civil Rights in the United States*, pp. 106-114. We leave for an appropriate case the question of whether we should apply Article II, § 11, par. 3 of our Constitution—which establishes the privilege against self-incrimination—to the issue of voluntariness of a confession. This would, of course, be in addition to the application thereto of Federal due process. See 52 Mich. L. Rev. 421, 426, footnote 28; 50 Mich. L. Rev. 567, 570.

pass as a preliminary matter on the issue of whether a confession was voluntary. The court hears the testimony of both parties, preferably out of the presence of the jury, on this question. If the evidence establishes as a matter of law that the confession was involuntary, it is excluded and is not presented to the jury. On the other hand, if the evidence as to voluntariness is conflicting, the trial court does not pass on its admissibility. Instead, the jury is recalled, the testimony as to voluntariness is repeated in its presence, and the confession is submitted to the jury. However, the jury is instructed (a) that the government has the burden of proof to establish the voluntariness of the confession; (b) that if the jury finds the confession was made voluntarily, its weight, as in the case of all other evidence properly admitted, is for the jury to determine; and (c) that if the jury finds the confession was involuntary, it must reject and disregard it. *People* v. *Medina*, 72 P.R.R. 241; *People* v. *Otero*, 67 P.R.R. 376; *People* v. *Declet*, 65 P.R.R. 22. [7]

■ Second—The Supreme Court of the United States accepts the findings of fact of the state courts as to the circumstances under which confessions were made. But it determines for itself by an independent review of the facts whether under the undisputed facts such confessions were coerced. In so doing, the Supreme Court, while taking the

---

[7] Ours—substantially similar to the procedure used in New York—is the minority rule. There are at least two other rules. First, many states and apparently the Federal courts have adopted the so-called "humane rule" under which the trial court is required to make an affirmative finding on conflicting evidence as to voluntariness; but if the trial court affirmatively admits the confession, the defendant has a second chance on admissibility, since the evidence as to voluntariness is repeated before the jury and the trial court must instruct the jury that if it finds the confession was involuntary, it must reject it. Second, the "orthodox rule" requires the trial court to determine finally and definitively whether a confession was involuntary; if the trial court admits the confession as voluntary, the evidence of the circumstances under which the confession was made may be reproduced before the jury in order to enable the jury to determine what weight to give the confession but not in order to attack its admissibility, which under the "orthodox rule" is determined exclusively by the trial court. Meltzer,

facts as found by the trial and appellate state courts, determines for itself as a matter of law the effect of those facts on the issue of the voluntariness of a confession. *Leyra* v. *Denno, supra; Stein* v. *New York, supra,* p. 182; *Watts* v. *Indiana, supra,* 50–52; *Lisenba* v. *California,* 314 U.S. 219, 238; *Chambers* v. *Florida,* 309 U.S. 227; Matherne, *Pretrial Confessions—A New Rule,* 22 Tenn. L.Rev. 1011, 1018, footnote 55. [8]

 Third—Another facet of the problem as to the respective functions of the trial court and the jury with reference to confessions should be noted here. *Stein* v. *New York, supra,* holds that (*a*) if the evidence as to voluntariness of a confession is conflicting and (*b*) if the state rule—both in Puerto Rico and under the "humane rule"—requires the jury under those circumstances to make the final determination as to admissibility of the confession, the Supreme Court of the United States will not reverse a state court conviction on the ground of lack of Federal due process provided the record contains other evidence sufficient to sustain the verdict. The theory behind the refusal of the Supreme Court to upset a state conviction under such circumstances is that it is impossible to tell whether the jury found the confession voluntary and therefore weighed it together with the other evidence, or whether it rejected the

---

*Involuntary Confessions: The Allocation of Responsibility Between Judge and Jury,* 21 U. Chi. L. Rev. 317, 319–25; 3 Wigmore on *Evidence,* 3rd. ed., § 861, pp. 347–8; *Comment,* 52 Mich. L. Rev. 421, 423–24; Annotation, 170 A.L.R. 567; McCormick, *Some Problems and Developments in the Admissibility of Confessions,* 24 Tex. L.Rev. 239, 250–51; Morgan, *supra,* Vol. II, pp. 249–50; Wicker, *supra,* p. 510 footnote 12 and 13; *Uniform Rules of Evidence,* Rule 63 (6); A.L. I. *Model Code of Evidence,* Rule 505; *United States* v. *Carignan, supra,* p. 38; *Stein* v. *New York, supra,* p. 172; *State* v. *Crank,* 142 P.2d 178 (Utah, 1943).

The Advisory Committee appointed by this Court to recommend Rules of Evidence has under consideration the possibility of adopting the "orthodox rule".

[8] The question of whether, in determining if a confession is voluntary, an even larger role is to be played by the trial and appellate state courts, respectively, is a matter of local law and not Federal constitutional law. See footnotes 7 and 10.

confession as involuntary but nevertheless convicted the defendant on the remaining testimony without taking the confession into consideration. *Stein* v. *New York, supra,* pp. 170–93. However, the *Stein* case has not changed the rule that admission in evidence in a state court case of a confession which under the *undisputed* facts is coerced violates the due process clause of the Fourteenth Amendment, despite the existence of other evidence sufficient to sustain the verdict. Morgan, *supra,* pp. 250–1; *The Supreme Court, 1952 Term,* 67 Harv.L.Rev. 91, 120–1; Miller, *The Supreme Court's Review of Hypothetical Alternatives in a State Confession Case,* 5 Syrac.L.Rev. 53; *Comment,* 52 Mich.L.Rev. 42; Scott, *State Criminal Procedure, The Fourteenth Amendment, and Prejudice,* 49 N.W.U.L.Rev. 319; *Annotation,* 97 L.Ed. 1555, 1556. *Cf.* Gorfinkel, *The Fourteenth Amendment and State Criminal Proceeding— "Ordered Liberty" or "Just Desserts",* 41 Calif.L.Rev. 672, 682–5.

In this case, in accordance with our local rule and as in the *Stein* case, the trial court submitted Exhibit 48 and the oral confession at San Antón to the jury, instructing it to consider them only if it found they were made voluntarily. In view of the testimony summarized herein, we assume that the other evidence, if believed by the jury, was sufficient without the confessions to sustain the verdict of murder in the first degree.[9] Under that assumption it is impossible, as in the *Stein* case, to tell here whether the jury found the written confession embodied in Exhibit 48 voluntary and weighed it together with the other evidence, or whether it rejected both this confession and the oral confession as involuntary but nevertheless convicted the defendant on the remaining testimony. Accordingly, under the constitutional rule which has not been changed by the *Stein* case, the ques-

[9] The familiar rule prevails in this jurisdiction that a confession is not admissible unless the *corpus delicti* is proved by independent evidence. *People* v. *Declet, supra; Comment,* 52 Mich. L. Rev. 421, 428; McCormick, *supra,* p. 246. This rule was obviously satisfied by the evidence herein.

tion still remains as to whether on the *undisputed facts* the trial court erred as a *matter of law* in not excluding the written confession embodied in Exhibit 48 for the People on the ground that it was extracted from the defendant by psychological coercion.[10] Consequently, we shall in (*b*), (*c*), (*d*), and (*e*), herein examine in detail—first separately and then together—the undisputed facts on which the defendant relies.

(*b*) *Was written confession—Exhibit 48—obtained by psychological coercion because defendant was "detained for investigation" more than 70 hours before he was questioned?*

 There is no dispute that Fournier was "detained for investigation" for three days. The only explanation offered by the district attorney was that the investigation was difficult and complicated and that Fournier was "detained for investigation" during this period of time because the district attorney was not ready to question Fournier until the night of October 9.

We have already seen that a district attorney in 1950 could and at present can subpoena witnesses, take their testimony, and file an information based thereon. Moreover, until July 25, 1952 a district attorney was a magistrate and was empowered to issue warrants of arrest and to fix bail. But we know of no provision of law in this jurisdiction whereby either a witness or a defendant may be "detained for investigation" by a district attorney for several days while the latter gathers evidence which will enable him to confront the witness or the defendant with the facts. Such a course of conduct is not countenanced by §§ 39–42 of the

---

[10] Any conflicts in the evidence as to the voluntariness of the confession must be resolved under our present rule by the jury, and not by the trial court or by this Court. See footnote 7; *People* v. *Rivera*, 66 P.R.R. 207, 210–11; *Stein* v. *New York*, *supra*. But, for the reasons noted in the text, the defendant may contend on appeal that the trial court erred in not excluding the confession as a matter of law on the basis of the undisputed facts.

Code of Criminal Procedure, 1935 ed., providing for the fixing of bond for material witnesses, or by § 527 of the same Code.

District Attorney Viera has shown in this and other cases that he is an able and zealous public official. Undoubtedly, it was largely due to his efforts that the horrible crime committed in this case was discovered. But his conduct in "detaining the defendant for investigation" for three days was wholly illegal. Whatever the practice in the past may have been, the concept of "detention for investigation" of a suspect is unknown to our law. We have only two categories for persons brought before a district attorney: witnesses and defendants. A witness is summoned; a defendant is arrested and bail is fixed promptly.[11] Aside from the fact that it would be improper to "detain a witness for investigation" for three days, the district attorney could scarcely contend that he was "detaining" Fournier as a witness for that would have automatically given Fournier immunity once he testified. *Batalla* v. *District Court, supra. Cf.* Act No. 3 of March 18, 1954. From the inception of the investigation, Fournier was a prospective defendant. Once he was "detained", it was the duty of the district attorney promptly to issue a warrant of arrest and to fix bail. The defendant could then have consulted friends, relatives, and his attorney, either in jail or while out on bond. But no warrant of arrest was issued charging Fournier with any offense. Instead, a detective brought him to the office of the

---

[11] For discussion of the alleged desirability of a statute providing for a brief period of detention for questioning without a formal warrant of arrest, see Orfield, *supra*, pp. 23–25, 38; 60 Yale L.J. 1228, 1230, footnote 8, and authorities cited; Warner, *The Uniform Arrest Act*, 28 Va. L.Rev. 315; Inbau, *The Confession Dilema in the United States Supreme Court*, 43 Ill. L.Rev. 442, 448–51, 460; 53 Yale L.J. 758, 769; McCormick, *supra*, 274; Waite, *The Law of Arrest*, 24 Tex. L.Rev. 279, 296–98; 39 Calif. L.Rev. 96, 99–102. *Cf.* Art II, § 10, par. 3 of our Constitution providing that "No warrant for arrest... shall issue except by judicial authority and only upon probable cause...".

district attorney early in the morning of October 7, 1950. And he was kept there or at other places incommunicado without the slightest shadow of legality until the afternoon of October 10, by which time he had confessed.

██ We by no means hold that a district attorney may not question a defendant, either before or after arrest, for a reasonable time. *Stein* v. *New York*, *supra*, pp. 184–5; *cf.* footnote 11. But that right and duty of the district attorney obviously does not justify the conduct of the district attorney in "detaining the defendant for investigation" for three days and nights without making any charge against him or issuing a warrant of arrest or fixing bail.[12]

██ What we have said makes it clear that the defendant made his written confession while he was under illegal detention. This fact, standing alone, is not violative of Federal due process. However, it is a major factor which is taken into consideration, together with all the other facts, in ascertaining whether a confession is produced by coercion and is therefore inadmissible on constitutional grounds. *Stein* v. *New York*, *supra*, pp. 187–8; *Stroble* v. *California*, 343 U.S. 181, 197; *Gallegos* v. *Nebraska*, *supra*, p. 65.

In seeking to determine if the written confession was psychologically coerced, we must not underestimate the importance of the fact that it was made while the defendant was being held incommunicado under illegal detention for three days. Impartial investigation has demonstrated that "[a] high percentage of improperly induced confessions

---

[12] The district attorney was technically accurate in telling the defendant he was not entitled to counsel during the investigation the former was conducting to determine if he should accuse the defendant of murder. *People* v. *Carmona*, *supra*; *People* v. *Montes*, *supra*; *People* v. *Travieso*, *supra*. But that rule obviously does not mean that a prospective *defendant* may be "detained for investigation" for days without a warrant of arrest or bond and without being permitted to consult counsel. Within a reasonable time after the defendant's "detention", it was the duty of the district attorney to issue a warrant of arrest and to fix bail promptly. And as soon as that was done, the defendant was entitled to consult counsel forthwith, either in jail pending bond or after release on bond.

occur while the suspect is being held 'on ice' in violation of arraignment statutes." Wicker, *supra*, p. 511. "Though illegal detention is frequently a mere expedient to gain time for investigation, it may also be effective in 'softening' the prisoner and making him more ready to confess." [13] And Mr. Justice Douglas, concurring in *Watts* v. *Indiana*, *supra*, describes graphically at p. 57 what may happen under such circumstances: "The man was held until he broke. Then and only then was he arraigned and given the protection which the law provides to all accused. Detention without arraignment is a time-honored method for keeping an accused under the exclusive control of the police. They can then operate at their leisure. The accused is wholly at their mercy. He is without the aid of counsel or friends . . . The procedure breeds coerced confessions. It is the root of the evil. It is the procedure without which the inquisition could not flourish in the country." [14]

In the light of the foregoing, we turn to the question of whether there was in this case other evidence of psychological

---

[13] National Commission on Law Observance and Enforcement-Report on Lawlessness in Law Enforcement, as quoted in Emerson and Haber, *supra*, p. 107.

[14] Mr. Justice Douglas uses this language in support of his minority view that the confession should be excluded on the sole ground that it was made while the defendant was under illegal detention. But it is also applicable to a large extent to the situation where that fact is one of the circumstances which are weighed in determining if a confession was coerced. In the same way his dissenting language in *Stroble* v. *California*, *supra*, p. 204, is pertinent here: "As long as . . . the police . . . hold persons incommunicado, coerced confessions will infect criminal trials in violation of the commands of due process of law."

The Supreme Court recently restated this same principle. "To delay arraignment, meanwhile holding the suspect incommunicado, facilitates and usually accompanies use of 'third-degree' methods. Therefore, we regard such occurrence as relevant circumstantial evidence in the inquiry as to physical or psychological coercion." *Stein* v. *New York*, *supra*, p. 187 (The court added that the jury in the *Stein* case was instructed to consider this evidence of illegal detention as one of the circumstances tending to show coercion. No such instruction was given in this case, which, as we hereinafter point out in Part VI, was an error on the part of the trial court).

coercion in addition to the circumstance that the confession was made while the defendant was under illegal detention.

(c) *Was written confession—Exhibit 48—obtained by psychological coercion because defendant was questioned without substantial interruption from 10 p.m. to 4 a.m.?*

 The defendant contends that his written confession was coerced because—as the undisputed facts show—on October 9–10, 1950 he was questioned uninterruptedly by the district attorney from 10 p.m. to 4 a.m., at which time he finally made the confession embodied in Exhibit 48.

The problem here is whether under the circumstances the confession was "plainly the product of the suction process of interrogation and therefore the reverse of voluntary." *Watts v. Indiana, supra,* 53. Or, stated another way, whether at the time the defendant was in possession of "mental freedom" to admit or to deny participation in the crime. *Ashcraft v. Tennessee,* 322 U. S. 143, 154; *Lyons v. Oklahoma,* 322 U. S. 596, 602; *Lisenba v. California, supra,* 241. Obviously, on this question, no two cases are exactly alike on their facts. In each case it must be determined whether, under all the circumstances, the specific defendant—not some other person who might have reacted differently—was actually coerced. There must be "... a weighing of the circumstances against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal." *Stein v. New York, supra,* p. 185. This is a difficult and often elusive task as it involves assessing the subjective ability of the particular confessor to withstand alleged coercive pressures.

 If the defendant relied in this case solely on the fact that the district attorney questioned him for 6 hours, we could not, in the light of the Supreme Court cases, hold that the written confession was psychologically coerced as a matter of law. In the *Ashcraft* case the defendant was questioned continuously for thirty-six hours with a light over

his head by relays of officers who did not permit the defendant to sleep or rest. This was held to be "inherently coercive". But the facts here are different: Fournier slept on October 7 and 8 and ate when he wished; he was questioned for only six hours on the night of October 9 by one person, District Attorney Viera, who was busy conducting the investigation and apparently did not sleep either on October 7 or October 8. *Haley* v. *Ohio*, 332 U. S. 596, involved a frightened, ignorant, fifteen-year old Negro boy who was arrested at midnight and questioned by relays of police from midnight to 5 a.m. In finding the confession coerced as a matter of law, the Supreme Court placed great emphasis on the fact that the defendant was "a mere child." In contrast, Fournier was an experienced, mature, educated, intelligent and well-to-do business man. In *Watts* v. *Indiana, supra; Turner* v. *Pennsylvania*, 338 U. S. 62; and *Harris* v. *South Carolina*, 338 U. S. 68, the defendants were held incommunicado in violation of state law and were subject to long periods of questioning by officers working in relays over a number of days. The defendant in this case was not subjected to that kind of physical and mental pressure.

In *Lisenba* v. *California, supra,* a confession was held not to be psychologically coerced as a matter of law despite the fact that the defendant, a mature and intelligent man with considerable business experience, had been illegally detained and had been subjected to protracted questioning over periods of time longer than in the instant case.[15] And the Supreme Court recently said that "...we have never gone so far as to hold that...extensive questioning of a prisoner automatically makes the evidence he gives in response constitutionally prohibited." *Stein* v. *New York, supra* p. 185. See also *Stroble* v. *California, supra; United States* v. *Carignan, supra; Gallegos* v. *Nebraska, supra*, 65–8; *Ward* v.

---

[15] It should be noted, however, that the Court stated that the "lawless practices" of the officers brought this case "close to the line" (p. 240).

*Texas*, 316 U. S. 547, 555; *State* v. *Vaszorich*, 98 A.2d 299 (N.J., 1953); *Reeves* v. *State*, 68 So.2d 14 (Ala., 1953); *Grear* v. *State*, 71 A.2d 24, 31 (Md., 1950); Miller, *supra.* p. 58. [16]

In view of the cases of the Supreme Court of the United States on this question, we cannot say that the mere fact that Fournier was questioned persistently for six hours during a night in itself made his written confession psychologically coerced *as a matter of law.* But it must be remembered that the defendant does not rely solely on the length of this questioning. He relies also (1) on the fact that the confession was made after illegal detention of three days, and (2) on another—the most important—factor, to which we now turn.

(*d*) *Was written confession—Exhibit 48—obtained by psychological coercion because of manner and nature of questioning which preceded written confession, as shown by Exhibit A of defendant?*

 The defendant contends that the written confession embodied in Exhibit 48 was improperly induced by the manner and nature of the protracted questioning—as evidenced by Exhibit A for the defendant—to which he was subjected for a number of hours before he made the statements contained in Exhibit 48.

As we have seen, when the district attorney offered in evidence the sworn statement which thereafter became Exhibit 48, the defendant asked that the district attorney be required to offer at the same time the prior sworn statement

---

[16] It is difficult to reconcile the holding in *Ashcraft* v. *Tennessee*, 322 U.S. 143, that 36 hours of questioning is "inherently coercive" with the statement in *Stein* v. *New York, supra*, p. 184, that "Interrogation is not inherently coercive, as is physical violence." It may be, however, that in the latter statement the court was referring only to questioning without any other factors which, added to the questioning, would result in coercion as a matter of law. In any event, for our purposes it is enough to say that 6 hours of questioning, without anything more, would not be inherently coercive of a man like Fournier.

made by the defendant on the same night. The trial court refused to make this ruling. Consequently, the defendant was compelled to introduce the latter thereafter as his own Exhibit A. The result was that the trial court did not have Exhibit A before it when it held that Exhibit 48 was not a coerced confession as a matter of law. We agree with the defendant that this was a serious error as the contents of Exhibit A were highly relevant to the issue of whether Exhibit 48 was a coerced confession as a matter of law. [17] And it is our duty to examine Exhibit 48 in the light of Exhibit A despite the failure of the trial court to do so.

Usually the preliminary questioning of an official pressing a defendant for a confession is not recorded stenographically. Fortunately for the defendant, part—apparently most—of this previous incident was recorded and is found in Exhibit A. An examination of the latter shows on its face that the district attorney was exerting great pressure on the defendant in order to produce the confession embodied in Exhibit 48. For reasons of his own, the district attorney spent hours on a lengthy and irrelevant discussion with the defendant. He then reminded the defendant that he had taken the latter to Fournier Cemetery on the afternoon of October 8 to see Iris' body after it had been discovered in tomb No. 4 earlier that day. (It will be recalled that Detective Torres testified that at the tomb the district attorney asked the defendant "whose body is that?"; that while the defendant "was looking at the grave, he was nervous and upset"; and that each time he was asked to identify the body, the defendant trembled and looked toward the grave.)

---

[17] As hereinafter noted, the same defective procedure took place with reference to the oral confession at San Antón. The district attorney inverted his proof and offered the oral confession made at San Antón before he offered Exhibit 48. He did this despite the fact that the statement contained in Exhibit 48 was made by the defendant before he made the San Antón statement. As a result, once again the trial court passed on the question of whether a confession was coerced as a matter of law without having all the surrounding circumstances before it. See footnote 33.

And he proceeded to show the defendant a photograph of Iris' body. This photograph is in the record and obviously had a gruesome effect on the defendant, Iris' ex-husband. Similar conduct, designed to intimidate, terrorize, and ultimately to force incriminating testimony from a suspect, is condemned in *Lyons* v. *Oklahoma, supra.* In that case it was (pp. 599–600) "...not disputed that the inquiry continued until two-thirty in the morning before an oral confession was obtained and that a pan of the victims' bones was placed in Lyon's lap by his interrogators *to bring about his confession.*" (Italics ours.) At p. 602 the Court characterizes this conduct as "...improper methods...used to obtain a confession...." And the dissenting opinion shows that the Court was unanimous on this point—a rare occurrence in this field. [18]

On the heels of this macabre episode—deliberately calculated to break the defendant—the district attorney immediately launched into a series of aggressive questions which we have set forth verbatim in Part I in our summary of Exhibit A. Even the cold record reflects vividly the trip-hammer effect of these questions as the district attorney pounded away at the defendant among other things about the nail and belt found on the body; about the grave he had dug; about the body, with a belt tied around the neck, which he had transported in his car and buried in the grave; and about the bloodstain on his car. One by one the district attorney offered to show the defendant the nail, the belt and the handkerchief which, according to the district attorney, the defendant used to strangle Iris. In the same way, he offered to show him the two shoes, the bracelet, the Kleenex, and the handbag belonging to Iris which were buried with Iris. And as to each question in this vein

---

[18] In the *Lyons* case the confession in question was not used at the trial. The Supreme Court characterized it as indicated in the text in considering its possible coercive effect on a subsequent confession which was introduced in evidence. See Part IV.

the district attorney recited that the defendant does not answer. Moreover, during this colloquy—which as it came to a close can be better described as a monologue by the district attorney—the latter made the startling statements that "You have to answer my questions one by one" and "You have the obligation to answer." [19] And when the defendant asserted that "I have my rights not to answer", the following occurred: "Q. Am I accusing you? A. Yes, they are accusations. Q. Of the murder of Iris Nereida Hernández, who was your ex-wife? A. You are accusing me and I do not have the words with which to answer you. Q. *Answer me.* A. It has to be a lawyer. Q. You do not have the right to be assisted by a lawyer on this occasion." [20] (Italics ours.)

Exhibit A is 84 pages, whereas Exhibit 48 is only 23 pages. The district attorney and Detective Torres testified that the defendant also made some oral statements during the night. Obviously, the colloquy between the district attorney and the defendant found in Exhibit A consumed most of the night of October 9–10, 1950, and the confession— Exhibit 48—came at or near daybreak. The record contains no indication of what interval of time, if any, elapsed between the two statements. And this is not established by the mere fact that the district attorney, for purposes of his own, ordered his stenographer to transcribe them separately and had the defendant sign only Exhibit 48. Nor was any ex-

---

[19] The defendant, as already noted in Part III(b), was not a witness, but an arrested suspect who was entitled to claim the privilege against self-incrimination.

[20] The rule to which the district attorney referred—that a defendant is not entitled to counsel during an investigation—does not exculpate his conduct in holding the defendant incommunicado for three days and in insisting that the defendant must answer without the advice of counsel. If he had been a witness, Fournier would have been entitled to immunity for this testimony. *Batalla* v. *District Court, supra; cf.* Act No. 3 of March 18, 1954. As a defendant, he could not be compelled to answer in view of the privilege against self-incrimination, and he was entitled to prompt release on bond, with the right to consult counsel forthwith. See footnote 12.

planation whatsoever offered by the government as to why the defendant suddenly reversed the defiant attitude he displayed in Exhibit A and meekly made the confession embodied in Exhibit 48. On the record before us no conclusion is possible except that the confession in Exhibit 48 was a direct product of the nature and content of the questioning in Exhibit A and that both statements were, for purposes of determining the voluntariness of the confession in Exhibit 48, a single, continuing transaction.

Exhibit 48 evolved immediately from and was part of the same pattern of conduct by the district attorney which is so starkly reflected in Exhibit A. Accordingly, the question arises whether Exhibit 48, due to this conduct, was a coerced confession violative of Federal due process. A formidable argument could be made, for the reasons stated herein, that —even without any of the other circumstances in this case— Exhibit 48 was a coerced confession because, as disclosed by Exhibit A, it was produced by the "suction process of interrogation" in which the defendant was deprived of his "mental freedom" to make "a reasoned choice" as to whether he should speak or remain silent. *Lee* v. *Mississippi*, 332 U. S. 742, 745, and cases cited in footnote 2. However, we put this question aside. We prefer to rest our decision on all the factors in this case, including those described in (*b*), (*c*) and (*d*) of this Part of our opinion.

(*e*) *Was written confession—Exhibit 48—obtained by psychological coercion due to combination of circumstances that defendant after being illegally detained for three days was questioned uninterruptedly for 6 hours in manner disclosed by Exhibit A?*

██ ██ We have undertaken, for the sake of clarity, to discuss each of the three questions involved in (*b*), (*c*) and (*d*) separately. But these incidents cannot be isolated and treated as if they occurred without any connection with each other. On final analysis, we must examine them together as constituting a concatenation of circumstances from which we must draw our conclusion.

Each of the episodes which we have discussed in (*b*), (*c*) and (*d*) is a formidable link in the chain of events on which the defendant relies in support of his contention that Exhibit A constitutes an improperly induced confession. The fact that a confession is made while under illegal detention does not in itself, for the reasons stated in Part II, vitiate the confession. But illegal detention is apt to breed coerced confessions, and the mere fact of illegal detention is an important factor in determining whether a confession was coerced. See text of opinion preceding footnote 14. Here this factor was aggravated by the long period of illegal detention—more than three days. No matter how considerately a person is treated as to food and sleep, detention for three days, combined as here with denial of access to friends, relatives or counsel, is in itself a form of pressure which, together with other circumstances, may result in an improperly induced confession.

■ Also, the bare fact of uninterrupted questioning for 6 hours during one night of this particular defendant—an educated, mature, experienced man with good social standing—would not in itself make the confession resulting from such questioning constitutionally vulnerable. But the situation becomes more serious precisely because this questioning was the culmination of a course of conduct which began with the detention of the defendant at the direction of the district attorney without the slightest shadow of legality. So that we have a defendant being closely questioned for an uninterrupted period of 6 hours throughout the night against a background of 3 days of illegal detention which, as noted in the previous paragraph, is in itself a form of pressure.

■ Finally, and most important of all, we have the kind of questioning found in Exhibit A which we described at length in (*d*) and which immediately preceded the confession embodied in Exhibit 48. A man is illegally detained three days. He is questioned for an entire night. This takes place after he has been taken to a cemetery and shown the body of his ex-wife, strangled and buried clandestinely a month

ago. He is shown photographs of the body and other objects used to kill her which were buried with the dead body. He is accused over and over again in the most aggressive manner of having murdered his ex-wife and is confronted step by step with the detailed theory as to how he allegedly murdered and buried her. In the latter stages of the questioning, the district attorney records the fact that he is making no answer to each of these detailed charges euphemistically put in the form of questions. He is told by the district attorney—contrary to law—that he has "the obligation to answer" and that he has no right to be assisted by counsel. And then suddenly —without any explanation in the record—the defendant turns tame and submissive and apparently makes a clean breast of his guilt. [21]

Although each case depends on its own facts, the Supreme Court has in the cases cited herein attempted to formulate a test to determine whether a confession has been psychologically coerced. For example, in *Watts* v. *Indiana, supra*, the opinion of Mr. Justice Frankfurter reads as follows at pp. 53–4: "A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here transpired to deny that this was a calculated endeavor to secure a confes-

---

[21] In *Haley* v. *Ohio, supra*, the opinion of four Justices gave little significance to a statement that under the circumstances therein a confessor was advised of his constitutional rights (p. 601): "Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law... ."

sion through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right. To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process." [22]

The undisputed facts in this case—examined in the light of the foregoing test—demonstrate that the defendant's will was overborne and that his confession—Exhibit 48—was wrung from him and did not represent the expression of a free and reasoned choice by him. See *People* v. *Leyra*, 98 N. E. 2d 553, 559 (N.Y., 1951). [23] The conclusion is inescapable that the manner and nature of the questioning as disclosed by Exhibit A—coming after (a) the illegal and incommunicado detention for three days, and (b) the uninterrupted questioning, for six hours throughout the night, during which the defendant was told by the district attorney that he was obliged to answer and was not entitled to counsel —produced at daybreak a confession, Exhibit 48, which was

---

[22] Two Justices concurred in this opinion; three other Justices concurred in the holding that the confession in question was coerced.

[23] In the *Leyra* case a conviction was reversed by the New York Court of Appeals because it found that a confession introduced in evidence was coerced as a matter of law. Although the facts there were somewhat different, the same principle as involved herein was applied because the confession (p. 559) "... took place in an atmosphere of the utmost pressure ... [with] ... a deliberate attempt to extract a confession through the ceaseless pressure ... [of] ... an unrelenting interrogation of the exhausted accused." For the subsequent history of the *Leyra* case, see footnote 37.

[24] The statement of Lic. Gaztambide which we have quoted in our summary of the testimony was admitted in evidence at the time testimony was being taken as to the voluntariness of the oral confession at San Antón. We therefore discuss its admissibility in Part V. But it should be noted that the prejudicial effect thereof undoubtedly extended not only to the oral confession but also to Exhibit 48, which as we have seen was admitted after the trial court admitted the oral confession despite the fact that the confession in Exhibit 48 was made before the oral confession.

psychologically coerced as a matter of law.[24] To hold otherwise would be to shirk our responsibility.[25]

 We are aware that the record contains substantial corroborating evidence which, if believed by the jury, tends to show that many of the statements in the written confession are true. But the Supreme Court has emphasized over and over again that such verification does not cure the violations of due process of law which bring about a coerced confession. "...Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', *Snyder* v. *Massachusetts*, 291 U. S. 97, 105, or are 'implicit in the concept of ordered liberty.' *Palko* v. *Connecticut*, 302 U. S. 319, 325." *Rochin* v. *California*, *supra*, p. 169. Accordingly, due process of law is not "...heedless of the means by which otherwise relevant and credible evidence is obtained." *Id.*, p. 172. On the contrary, as pointed out in *Lisenba* v. *California*, *supra*, p. 236: "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." And in *Rochin* v. *California*, *supra*, at pp. 172–3 the court referred to "...the series of recent cases [which] enforced the constitutional principle that the States may not base convictions upon confessions, however much verified, obtained by coercion..." It added at p. 173: "...Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause

---

[25] The Supreme Court recently intimated that some state courts "... feel a diminished sense of responsibility for protecting defendants in confession cases" on the theory that the Supreme Court will take corrective action if the case eventually reaches it. *Stein* v. *New York*, *supra*, p. 180. But, as pointed in the *Stein* case, the primary responsibility in safeguarding the constitutional rights of such defendants is in the state courts.

even though statements contained in them may be independently established as true...". To the same effect, *Haley* v. *Ohio, supra; Watts* v. *Indiana, supra; Ward* v. *Texas, supra; Ashcraft* v. *Tennessee, supra; Turner* v. *Pennsylvania, supra; Harris* v. *South Carolina, supra; Allen, supra,* p. 19; *Miller, supra,* p. 55.

 Although the government does not raise the question, we have considered the possibility that the defendant "adopted" the contents of Exhibit 48 and thereby eliminated from the case the issue as to whether it was a voluntary confession. As we have seen, when the government rested, counsel for the defendant stated as his theory that the defendant admitted Iris' death occurred as described in Exhibit 48. Moreover, the manner in which the defense was conducted makes it fairly clear that the defendant was endeavouring to establish not that he was innocent but that he was at the most guilty of voluntary manslaughter because he killed Iris in the heat of passion. All the testimony of the defendant was directed toward this end: The only proof offered on behalf of the defendant, aside from Exhibit A, was testimony purporting to show that he was emotionally unstable and therefore more likely to perform an act in the heat of passion than an emotionally normal person. [26]

Wigmore expresses the view, citing *State* v. *Johnny*, 87 Pac. 3, 7 (Nev., 1906), and *Parker* v. *State*, 238 S.W. 943, 948-9 (Tex., 1922), that "A subsequent confirmation by the *accused's own acknowledgment* of the correctness of the confession should...relieve from any inquiry...into the volun-

---

[26] In announcing this theory of the defendant and in confining themselves to an attempt to bring about a verdict of manslaughter rather than murder in the first degree, counsel for the defendant did not under the circumstances violate (a) either the rules laid down in *Nieves* v. *Jones, Acting. Warden,* 72 P.R.R. 272, and *Jiménez* v. *Jones, Warden,* 74 P.R.R. 240, (b) or the rule against unauthorized statements by counsel on behalf of a defendant, *cf. Morgan, supra,* Vol. II, p. 237; 4 Wigmore, *supra,* § 1063, p. 43, 1953 Supp., p. 23; and Part V where we discuss the statement of Lic. Gaztambide.

tariness in general of the confession...". And, for present purposes, we see no substantial difference between a case where a defendant takes the witness stand and repeats part of the contents of a confession and this case where the defendant in effect does the same thing by conceding the truth of part of a confession through counsel without taking the stand and thereby escaping cross-examination. However, the Supreme Court has not passed on this question. And it is not clear whether it would agree with Wigmore. The possibility exists that the court might hold—contrary to the view expressed by Wigmore—that reversible error is committed as a matter of due process of law if a coerced confession is admitted in evidence, even if the defendant thereafter "adopts" the confession during the presentation of his testimony. *Cf. Chambers* v. *Florida, supra,* footnote 2, where the judgment which was reversed included three defendants who pleaded guilty; *Ashcraft* v. *Tennessee,* 327 U. S. 274. In view of the uncertainty of the law on this point, we leave this particular question open.[27] Instead we assume, without deciding, that Wigmore's view is correct and that "adoption" by a defendant of a confession eliminates the issue of its voluntariness. •

The principal difficulty here is that a careful examination of the statement by counsel for the defendant shows that he did not in fact adopt the confession—Exhibit 48— *in toto.* On the contrary, he merely conceded that Iris' death occurred as described therein. But Exhibit 48 contains a number of seriously incriminating statements by the defendant on such matters as the subsequent conduct of the defendant in disposing of the body. And this conduct, if it occurred, tends to support the theory of the government that

---

[27] *Cf. Lee* v. *Mississippi, supra; Ashcraft* v. *Tennessee,* 322 U. S. 143, 152; *White* v. *Texas supra,* pp. 531–2; and *People* v. *Leyra, supra,* holding that a defendant who denies he confessed is not thereby precluded from contending that the alleged confession was coerced.

the defendant was guilty of murder in the first degree, in contrast to the contention of the defendant that at the most he was guilty of manslaughter. The defendant strenuously opposed admission of Exhibit 48 on the ground that it was a coerced confession. That this issue remained in the case, even after the defendant stated his theory and introduced testimony to support it, is shown by the instruction to the jury in the event it found that Exhibit 48 was made involuntarily. [28] The fact that the defendant admitted in his theory that one part of the confession was true—the manner in which Iris' death occurred—did not eliminate from the case the issue that Exhibit 48—which contained other incriminating statements—was a coerced confession in violation of Federal due process of law. [29]

We do not hold that a confession is psychologically coerced because a district attorney persuades a defendant to confess by confronting him with the evidence already available against him. The rule applicable in such a case is stated in *Stein* v. *New York, supra*, at pp. 185–6: "The inward consciousness of having committed a murder...and of being confronted with evidence of guilt which they could neither deny nor explain seems enough to account for the confessions here. These men were not young, soft, ignorant

---

[28] We discuss that instruction in Part VI. The government does not contend that Exhibit 48 was an admission rather than a confession, *People* v. *Dones*, 56 P.R.R. 201, 209. We therefore do not stop to determine whether the rule barring coerced confession under the due process clause applies to coerced admissions. Compare *Stein* v. *New York, supra*, pp. 162–3, footnote 5, and *People* v. *Rodríguez*, 65 P.R.R. 498, with *Ashcraft* v. *Tennessee*, 327 U.S. 274; see *Morgan, supra*, Vol. II, 245, 249, Dession, etc., Drug-Induced Revelation and Criminal Investigation, 62 Yale L.J. 315, 336. In the context of this case, under the theory of both the government and the defendant, the contents of Exhibit 48 as a whole can be classified in no other way than as a confession.

[29] Even if Exhibit 48 were not constitutionally objectionable because the defendant adopted it the fact that it was originally a coerced confession would still be an influential factor in this case: It would still have to be determined whether the coercion which produced Exhibit 48 carried over and resulted in another coerced oral confession at San Antón, which was much more incriminating than Exhibit 48. See Part IV.

or timid.... Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary. Cooper's and Stein's confessions obviously came when they were convinced that their dance was over and the time had come to pay the fiddler.... Both confessions were 'voluntary', in the only sense in which confessions to the police by one under arrest and suspicion ever are." We have already made it clear why the circumstances of this case were different.

It is unfortunate that the trial court did not have Exhibit A before it when it refused to exclude Exhibit 48. Perhaps it would have reached the same conclusion as we do if it had examined them together. In any event, for the reasons stated, the trial court erred in not excluding Exhibit 48 on the ground that it was a confession which was psychologically coerced as a matter of law and was therefore obtained in violation of Federal due process of law. [30]

## IV

*Was oral confession at San Antón inadmissible in evidence on ground it was obtained by psychological coercion in violation of law?*

▮▮▮▮▮▮ The defendant contended in the trial court that his oral confession at San Antón was inadmissible as a coerced confession. However, he does not renew that argument on appeal. The only contention he now makes with

---

[30] For collections of cases and discussions concerning the problem of coerced confessions, see Emerson and Haber, *supra*, pp. 106–48; 3 Wigmore, *supra*, 1953 Supp., pp. 69–78; Wicker, *supra*, 5 Vand. L. Rev. 507, 515–20; Ladd, *Cases and Materials on Evidence*, pp. 427–8; Annotation, 93 L. ed. 115; *Supreme Court, 1952 Term*, 67 Harv. L. Rev. 91, 118–20; Boskey and Pickering, *Federal Restrictions on State Criminal Procedure*, 13 U. Chi. L. Rev. 266, 282–95; Allen, *supra*, 48 N.W. U. L. Rev. 16; Matherne, *supra*, 22 Tenn. L. Rev. 1011; Wood, *Due Process of Law, 1923–1949*, pp. 218–37.

reference thereto is that the trial court erred in admiting it since it was an oral statement made "contemporaneously" with the written statement, Exhibit 48. The defendant argues that the oral confession at San Antón should have been excluded in view of the fact that he had already made a written statement.[31] He relies on *People* v. *Méndez*, 54 P.R.R. 184; *People* v. *Saltari*, 53 P.R.R. 850; *The People* v. *Flores*, 17 P.R.R. 166. But these cases make it clear that while oral testimony is not admissible to show the contents of a written declaration, the fact that a written statement was made does not exclude testimony as to other statements made orally. The testimony of Casenave and Ramírez Brau as to the oral confession was therefore not inadmissible merely because the defendant had made a previous or "contemporary" written statement.

The defendant does not argue on appeal that the San Antón oral confession was psychologically coerced. However, that question is so obvious and so serious that we examine it on our own initiative. *Cf. Brown* v. *Allen*, 344 U. S. 443; *Leyra* v. *Denno, supra*[32] In view of our holding in Part III (*e*) that the written confession made during the night of October 9–10 should have been excluded as a psy-

---

[31] The defendant also makes this same argument with reference to the oral statements he made at the office of the district attorney during the night of October 9–10. However, as we read the testimony of the district attorney and of Detective Torres, the oral statements the defendant made on the night of October 9–10—except for those reduced to writing in Exhibits 48 and A, which we have considered above—were not of any substantial significance. See footnote 1. Moreover, even if we assume the contrary, any incriminating oral statements made by Fournier between the time he made the statements in Exhibits 48 and A would be inadmissible for the reasons stated in Part III(e).

[32] It is particularly important that we examine this question in view of the fact that the oral confession at San Antón was much more incriminating than the defendant's written confession made during the previous night. In the latter he said in effect that his ex-wife was trying to strangle herself with her belt and in a fit of rage he grabbed the belt and twisted it. On the other hand, at San Antón the defendant said that when he hit Iris she became unconscious, and that he then put the belt around her neck and strangled her by using a nail to twist the belt.

chologically coerced confession, the problem emerges as to the admissibility of the oral confession at San Antón. If a confession is made involuntarily, a subsequent confession while the defendant is still under the operation of the same influences is also involuntary. Moreover, a presumption or inference arises that these same influences have continued. This presumption or inference may be overcome only by proving beyond a reasonable doubt that the said influences have ceased to exist. *Leyra* v. *Denno, supra,* p. 634; *Lyons* v. *Oklahoma, supra,* pp. 597, 600–3; *United States* v. *Bayer,* 331 U.S. 532, 540–1; *Malinski* v. *New York,* 324 U. S. 401, 410; *Reeves* v. *State,* 68 So. 2d 14, 18 (Ala., 1953); *People* v. *Thomlison,* 81 N. E. 2d 434 (Ill., 1948); 3 Wigmore *supra.* § 855, 1953 Supp., p. 82.

The question here is whether under the foregoing test the effect of the coercive acts which produced Exhibit 48 carried over and also made the oral confession at San Antón a coerced confession as a matter of law. [33] Here again, as in the case of Exhibit 48, we must bear in mind two propositions. First, this is a difficult and elusive task which involves a subjective determination as to the impact of all the circumstances on a specific individual—the defendant. Second, only the undisputed facts may be taken into consideration in ascertaining whether the oral confession was coerced as a matter of law.

---

[33] The trial court did not pass on this question because the government offered the testimony as to the oral confession before it offered Exhibit 48, despite the fact that the confession in the latter preceded the oral confession. However, the testimony adduced before the trial court out of the presence of the jury on the preliminary issue of the voluntariness of the oral confession clearly showed that during the previous night the defendant had made written statements which were closely related to the oral confession in point of time. The trial court should therefore have required the district attorney to produce Exhibits 48 and A and should have then ruled on the admissibility of the oral confession in the light of those Exhibits. In any event, we must now face the problem of whether the coerced written confession vitiated the subsequent oral confession as a matter of law.

The questioning which resulted in Exhibit 48 had been concluded at daybreak, or at approximately 6 A.M. [34] The trip to San Antón was made at the request of the defendant, who had to lead the group accompaying him as they did not know where the defendant's house at San Antón was located. The defendant was not handcuffed during this trip. Approximately six hours elapsed between the two confessions. [35] The confession at San Antón was made in the presence of a member of newspapermen, photographers, detectives, policemen, and the district attorney. While he was making the confession at San Antón, Fournier was tranquil, expressed himself in a quiet voice, spoke normally, and spontaneously told his story and acted out the manner in which he had taken the body through the window. While he was at San Antón, the defendant's "actions" were completely "free" and he was completely serene. The newspapermen asked him any question they wished and he responded readily to them. The photographs taken at San Antón, for which the defendant posed "freely", show him as apparently calm, self-possessed and in good physical condition, acting out the manner in which he had killed Iris and had removed her body. Detective Torres found some fibres from Iris' belt in the drainpipe after Fournier told him at San Antón that he had put them there after killing Iris. While he was at San Antón the defendant was photographed searching for a button which had been torn from Iris' dress and which he said he had thrown behind the house at the time he killed her.

---

[34] We take judicial notice that on October 10, 1950 the sun rose in San Juan at 6:16 A. M.

The district attorney testified that at 4 a. m. he was ". . . in the last stages of the direct and oral examination of the defendant . . ."; that he was still questioning the defendant at 4 a.m.; and that, after the defendant stated he would not answer except in the presence of counsel, he continued to answer, and this was at daybreak.

[35] The testimony was that the group arrived at San Antón at 11:30 a.m. and remained there, while the defendant was making his confession, until 12:30 or 1 p.m.

In view of the undisputed facts recited in the previous paragraph, we cannot hold *as a matter of law* that when he made his oral confession at San Antón the defendant was still under the coercive influences which produced Exhibit 48. We recognize that Fournier had no sleep during the night of October 9–10; that he was apparently given only coffee for breakfast; that he had not yet consulted counsel and was still under custody; and that, in the words of the district attorney, they went to San Antón "to continue the questioning on the ground and with things in view...".

These latter facts are appropriate for the jury to weigh in determining whether *as a matter of fact* the coercion resulting in Exhibit 48 had carried over or instead had been dissipated by the time the defendant confessed at San Antón. But, unlike the circumstances under which the defendant made his written confession, the facts do not unmistakably point to only one answer *as a matter of law*. The trial court therefore did not err in submitting to the jury the issue of whether the oral confession at San Antón was coerced, although as noted in Part VI, its instructions with reference thereto were not adequate.

We believe the Supreme Court cases support our position. *United States* v. *Bayer, supra,* is not in point as several months elapsed between the two confessions in that case. *Lyons* v. *Oklahoma, supra,* is closer to our case. There, a suspect, kept in jail for 11 days, was intensively questioned throughout most of the night. He confessed when a pan containing the victim's bones was placed in his lap. At 4 a.m. he was taken to the scene of the crime and was questioned further. He was returned to jail, and early in the afternoon of the same day he was taken to a nearby town. Later in the same day, he was taken to the penitentiary where between 8 and 11 p.m. a written confession was obtained from him by the warden. Only the second confession was used at his trial, and he was convicted. The Supreme

Court refused to hold that as a matter of law the defects of the first confession vitiated the second one.

The *Lyons* case is similar to the present case in that the defendant was never out of custody between the admittedly coerced confession and the second confession. The fact that in the *Lyons* case 12 or more hours elapsed between the two as contrasted with approximately 6 hours in this case does not make the *Lyons* case inapplicable here. This is particularly true when we add in our case the factor that, instead of confessing as in the *Lyons* case to a warden alone in a penitentiary, Fournier did so "freely" in the presence of newspapermen and photographers, who took a number of photographs of Fournier acting out the crime.[36]

*Leyra* v. *Denno, supra,* is distinguishable.[37] There a defendant, who had been virtually hypnotized by a state-employed psychiatrist into making a confession, subsequently made a series of other confessions. One was made apparently a few minutes later to a police captain; another was made immediately following this confession to the defendant's business partner; the last was made to two assistant prosecutors ". . . several hours after the psychiatrist took petitioner in charge." 98 L. Ed. at p. 634. The Supreme Court held that as a matter of law all the later confessions were infected

---

[36] While this fact tends to refute the contention as to involuntariness, we do not condone the conduct of the district attorney in inviting newspapermen to San Antón. See Part VII.

[37] In the *Leyra* case the New York Court of Appeals reversed the first conviction on the ground that the confession made to a psychiatrist was coerced as a matter of law and was therefore improperly admitted in evidence. 98 N.E. 2d 553. The same court affirmed a second conviction on the ground that the trial court did not err in refusing to exclude the subsequent confessions as tainted as a matter of law by the first confession and in submitting that question to the jury. 108 N.E. 2d 673. The Supreme Court denied certiorari in the latter case. 345 U. S. 918. The defendant then filed a petition for a writ of habeas corpus in the United States District Court. Under the rule laid down in *Brown* v. *Allen,* 344 U. S. 443, the district court considered the petition but denied it. 113 F. Supp. 556. The Court of Appeals affirmed. 208 F.2d 605. The Supreme Court thereupon granted certiorari and reversed the judgment of the Court of Appeals denying the petition for a writ of habeas corpus. 347 U.S. 556, 98 L. Ed. 631.

with the vice of the first confession. The court said in 98 L. Ed. at p. 634: "Unlike the circumstances in *Lyons* v. *Oklahoma* 322 U. S. 596, 602, 603, the undisputed facts in this case are irreconcilable with petitioner's mental freedom 'to confess or deny a suspected participation in a crime', and the relation of the confessions . . . is 'so close that one must say the facts of one control the character of the other . . .'. All were simply parts of one continuous process."

In the *Leyra* case all the confessions came in ". . . rapid succession . . . within a period of about five hours . . ." as a result of the ". . . almost trance-like submission . . ." of the defendant to ". . . the arts of a highly skilled psychiatrist." 98 L. Ed. at 634. They were an unbroken sequence of events produced by a single pattern of conduct. In our case the interval of approximately 6 hours between the two confessions was somewhat longer than in the *Leyra* case.[38] But, more important, the facts here do not foreclose absolutely the possibility that the kind of influence used to obtain Exhibit 48—quite different from psychiatric hypnotism—had worn off and that the defendant had regained his "mental freedom" by the time he spoke "freely" in the presence of a large number of newspapermen. Accordingly, the trial court did not err in leaving for the jury the problem of determining whether as a question of fact the coercive influence which brought about the first confession also contaminated the oral confession at San Antón.

V

*Was statement by counsel that defendant's confession was voluntary admissible in evidence?*

■■ The defendant contends that the trial court erred in admitting in evidence the statement made by Lic. Gaztam-

---

[38] In the *Leyra* case the involuntary confession to the psychiatrist was followed by a confession a few minutes later to a police captain. Half an hour later the defendant confessed to his business partner. Two and a half hours after the confession to the police captain, the defendant confessed to the assistant district attorney. See 98 L. Ed. at p. 646, dissenting opinion.

bide at the habeas corpus hearing on the afternoon of October 10, 1950 to the effect that the defendant had told him that . . . "his statement or confession was wholly voluntary . . .", and that Lic. Gaztambide "reaffirmed" that the ". . . statement or confession was absolutely voluntary . . . ."

We assume that the refusal of counsel for the defendant to give any grounds for his objection to the admission of this document waived the possible objection that this was hearsay testimony. But aside from the question of hearsay, the document was so obviously inadmissible and so prejudicial to the defendant that the trial court should have excluded it despite the refusal of counsel for the defendant to state any specific grounds of objection thereto.

"Obviously an attorney has some authority to speak for his client." Morgan, *supra*, Vol. II, p. 237; *People* v. *Vargas*, 74 P.R.R. 134; *Russell & Co.* v. *Padrón*, 61 P.R.R. 739; *Concepción* v. *Latoni*, 51 P.R.R. 547; *Ex Parte Morales*, 30 P.R.R. 848, 854; *People* v. *Peters*, 216 P. 2d 145 (Calif. 1950); IV Wigmore, *supra*, § 1063, p. 43, 1953 Supp., p. 23. But for an attorney to be a "talking agent" for a client, he must be talking on a relevant issue. During litigation —particularly a criminal case charging murder in the first degree—a declaration by an attorney, in order to bind the client, must not only be distinct and deliberate but also *relevant*. See 2 Morgan, *supra*, p. 237; IV Wigmore, *supra*, § 1063, p. 43, 1953 Supp., p. 23; *Kennedy* v. *Emeral Coal & Coke Co.*, 42 A. (2) 398, 407 (Del. 1944). Here the attorney made the statement in question when he was in the process of announcing that he was desisting from a petition for a writ of habeas corpus and was asking that bond be fixed. We need not examine the question of whether such a statement by an attorney would be relevant—and binding on a defendant—if a hearing on the petition had been held and the confession had been offered in evidence. The fact is that no hearing was held. The statement was therefore wholly irrelevant to the only step the attorney was taking: desisting from

the petition and asking that bond be fixed. And a defendant could scarcely be expected, under such circumstances, to interrupt his attorney and disavow his statement. [39]

We do not question the good faith of Lic. Gaztambide and are certain that he was acting in what he then regarded as the best interests of his client—perhaps in an effort ultimately to obtain some ameliorating treatment for his client. At the time he spoke Lic. Gaztambide apparently did not know the contents of Exhibit A, on which we have relied so heavily in holding that Exhibit 48 was a coerced confession as a matter of law. In any event, the fact remains that his statement was improperly taken into consideration by the trial court in passing as a preliminary matter on whether the San Antón confession was coerced as a matter of law.[40]

## VI

*Was jury instructed correctly on voluntariness of confessions?*

 There were no specific objections with reference to the instructions given to the jury on voluntariness of the confessions. Nor does the defendant complain of them on appeal, except as to the failure of the trial court to tell the jury to examine Exhibit 48 in the light of Exhibit A. But we

---

[39] We do not stop to determine whether the statement of Lic. Gaztambide was also inadmissible because it embodied a conclusion—that the confession was voluntary—rather than the facts and surrounding circumstances from which the trial court—or the jury—would come to its own conclusion as to voluntariness. *Cf. United States* v. *Denno,* 208 F. 2d 605, 608–9 (C.A. 2, 1953), reversed for other reasons in *Leyra* v. *Denno, supra,* where psychiatrists—not attorneys—were permitted to give their opinions as to the effect of the mental coercion which produced a first confession on the voluntariness of subsequent confessions.

[40] The statement of Lic. Gaztambide was of course also prejudicial to the defendant when it was submitted to the jury on the issue of voluntariness of both confessions. As to Exhibit 48, the matter is now moot, as we have held that Exhibit 48 should never have been submitted to the jury. See Part III *(e)*. As to the San Antón confession, the statement of Lic. Gaztambide is inadmissible and must be excluded at the new trial both on the preliminary issue of voluntariness heard by the trial court alone and on the same issue if and when it is submitted to the jury.

call attention to certain errors therein, particularly as the oral confession may possibly be submitted to the jury at a new trial.

The trial court instructed the jury that if it found the confessions voluntary, to weigh them together with the other evidence; and that "If they understand that the said confession was not voluntary, then it is within their powers to reject it in order to decide the case in one form or another." Even on the assumption—contrary to the conclusion we have reached—that the trial court acted correctly in refusing to exclude Exhibit 48 as a matter of law and in submitting the issue of the voluntariness thereof to the jury for it to determine as a question of fact, this instruction was erroneous in three respects. First, the trial court should have instructed the jury that if it found the confessions involuntary, it *must* reject them; it was an error to instruct the jury that under those circumstances it is ". . . within their powers to reject it . . .".

Second, the foregoing instruction gave the jury no guidance as to what elements make up the concept of voluntariness. This is an important matter, although it does not involve due process.[41] So long as the jury continues in this jurisdiction to pass on the admissibility of confessions as distinguished from their weight or credibility, see footnote 7, the trial court must instruct it as to the indicia of coercion. Instructions which as here merely state abstractly that a confession may be considered if made voluntarily, fail to advise the jury of the factors ". . . which the Supreme Court has declared to be relevant to the issue of whether the reception of a confession violates the Fourteenth Amendment." Meltzer,

---

[41] The question of how specific an instruction in a state court must be upon the involuntary character of a confession is, as a matter of procedure or practice, solely for the courts of the state. *Lyons* v. *Oklahoma*, *supra*, p. 601. Meltzer, *supra*, criticizes this view, stating that the Supreme Court (p. 328) ". . . has austerely limited, if not abdicated, its responsibility with respect to the adequacy of state approved instructions." In any event, we establish herein such necessary standards as a matter of local law.

*supra,* p. 328. In the context of this case, the trial court should therefore have specifically instructed the jury that on the issue of whether Exhibit 48 was a voluntary confession, it should take into consideration (1) the personal background of the defendant as reflected in the testimony, (2) the fact that he was illegally detained for three days without the opportunity to consult counsel or friends, (3) the uninterrupted questioning of the defendant throughout the night of October 9–10, and (4) the nature, manner and content of the questioning which resulted in Exhibit 48, as disclosed by Exhibit A. *Leyra* v. *Denno, supra.*

Third, the trial court should have instructed the jury that if it found that the confession in Exhibit 48 was involuntary, an inference would then arise that the subsequent oral confession at San Antón was involuntary because of the same coercive influences which invalidated Exhibit 48 and that this inference could be overcome only if it were shown beyond a reasonable doubt that the said influences had ceased to exist when the defendant made the oral confession. *People* v. *Leyra,* 98 N. E. 2d 533, 560, (N. Y., 1951).[42]

For the reasons noted in Part III (*e*), in view of the fact that Exhibit 48 was a coerced confession as a matter of law, at the new trial it will not be admissible in evidence for the truth of the statements contained therein. However, if the government offers the oral confession at the new trial, the court must avoid errors similar to the three errors it made at the first trial. Under those circumstances, the court must require that Exhibits 48 and A be introduced in evidence for a limited purpose: solely to show the coercive influences which produced Exhibit 48. And the court must instruct the jury that Exhibit 48 was a coerced confession as a matter of law,

---

[42] "These confessions should have been separately considered in the light of the coercion existing at the time of defendant's statement . . . and only if the jury were satisfied beyong a reasonable doubt that such coercion had ceased to influence defendant could they consider the latter confessions. Only thus would due process of law be accorded defendant." *People* v. *Leyra,* 98 N. E. 2d 553, 560, (N.Y., 1951).

is not to be considered by it on the issue of guilt, and is admitted in evidence and is relevant only as to the voluntariness of the oral confession; that since the first confession was coerced, there is a presumption or inference that the oral confession was similarly coerced; that this presumption or inference can be overcome only if the evidence shows beyond a reasonable doubt that the coercive influences had ceased to exist when the defendant made his oral confession; and that in determining whether the said coercive influences had carried over as a matter of fact to the oral confession, under the circumstances of this case the jury must take into consideration the four factors noted above: (1) defendant's background, (2) his illegal detention, (3) the all-night questioning, and (4) the nature of the latter.

Every member of this Court has served in the past either as a prosecutor or as a trial judge. We are therefore fully aware of the problems of prosecuting crime and of the desirability of obtaining confessions to crimes. We do not hold that a district attorney may not question a defendant, either before or after arrest, for a reasonable time. Undoubtedly, interrogation of both suspects and witnesses is of great social value in the apprehension and conviction of those guilty of serious crimes.[43] Moreover, "[i]t is common knowledge that extortion of confessions by third-degree methods is charged falsely as well as denied falsely." *Stein* v. *New York, supra,* p. 181.

There is, however, another side of the picture. One of the hallmarks of totalitarianism is the use of coerced confessions to achieve its objectives. Ours is a different way of

---

[43] "By their own answers many suspects clear themselves and the information they give frequently points to another who is guilty. Indeed, interrogation of those who know something about the facts is the chief means of solution of crime. The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness." *Stein* v. *New York, supra,* p. 184.

life. Due process of law is woven into the fabric of our life and law under democracy. These are not ". . . doctrinaire or sentimental views." *Malinski* v. *New York, supra,* p. 420, Opinion of Mr. Justice Frankfurter. For us no value is more sacred than the proposition that a defendant may not be convicted of a crime, however convinced we are of his guilt, if a coerced confession has been admitted in evidence against him. Even if we assume that today a guilty defendant temporarily escapes, tomorrow this great principle will protect the innocent.

We add that brutality and pressure can never be satisfactory substitutes for scientific and detailed investigation as instruments of detection of crime. The head of our greatest governmental investigative agency recently made this clear: "One of the quickest ways for any law enforcement officer to bring public disrepute upon himself, his organization and the entire profession is to be found guilty of a violation of civil rights . . . Civil rights violations are all the more regrettable because they are so unnecessary. *Professional standards in law enforcement provide for fighting crime with intelligence* rather than force." J. Edgar Hoover, FBI Law Enforcement Bulletin, September, 1952, p. 1, quoted by Mr. Justice Frankfurter, in his dissenting opinion in *Stein* v. *New York, supra,* pp. 202–3 (Italics ours).

The defendant is accused of a horrible crime. After a long and hard-fought trial, he was convicted by a jury of murder in the first degree and sentenced to life imprisonment. But the defendant did not receive a fair trial because a confession extracted from him in violation of due process of law was introduced in evidence against him. Society will be better served by a new trial which we shall order in this case.

## VII

### *Pretrial Publicity*

The defendant contends that he was deprived of his right to a fair and impartial trial by the excessive

publicity which his confession allegedly received in the press. Our conclusion that his written confession was improperly admitted in evidence will require a new trial in this case. It is therefore perhaps unnecessary to discuss this argument. However, in view of its importance we shall examine it.[44]

The difficulty with this contention is that it was not raised in the trial court. Nor did the defendant request a postponement or change of venue on this ground. In addition, there is nothing in the record before us showing the extent of the publicity given to the confession. The defendant points only to the fact that the district attorney himself invited the newspapermen and press photographers to join him and the defendant at San Antón. Without even giving us the names and dates of the newspapers in question, the defendant asks us simply to take judicial notice of the press accounts of the case, and to reverse the judgment on the basis thereof. The defendant failed to put the trial court and this Court in a position to pass on his contention. We therefore have no basis for reversing the verdict on the ground that excessive publicity, stimulated by the district attorney, prevented a fair and impartial trial at the time the defendant was tried; i. e., 3½ months after he confessed.

However, we think it appropriate to point out that there are circumstances under which release to the press of a confession or other evidence by a district attorney prior to trial would be held to impair the right of a defendant to a fair and impartial trial. Cf. Stroble v. California, supra, 191–5, and particularly the dissenting opinion of Mr. Justice Frankfurter, p. 198; Shepheld v. Florida, 341 U.S. 50, concurring opinion of Mr. Justice Jackson and Mr. Justice Frankfurter; memorandum of Mr. Justice Frankfurter in Leviton v. United States, 343 U.S. 946; Baltimore Radio Show v. State, 67 A.2d 497 (Md., 1949) cert. denied in Maryland v. Baltimore Radio Show, Inc. et al., 338 U.S. 912, opinion of Mr.

---

[44] We find it unnecessary to discuss the remaining errors assigned by the defendant.

Justice Frankfurter respecting the denial of the petition for certiorari; *Grammer* v. *State*, 100 A.2d 257 (Md., 1953); Note, *Inflammatory Pre-Trial Releases by the Prosecutor and the Due Process Clause*, 47 N.W. U. L. Rev. 728; Note, 63 Harv. L. Rev. 840; Allen, *supra*, 29, footnote 59; *Delaney* v. *United States*, 199 F.2d 107 (C.A. 1, 1952). In his concurring opinion in *Shepherd* v. *Florida, supra*, Mr. Justice Jackson describes what occurred in that case and why in his view it violated due process in the following language at pp. 51–3:

"But prejudicial influences outside the courtroom, becoming all too typical of a highly publicized trial, were brought to bear on this jury with such force that the conclusion is inescapable that these defendants were prejudged as guilty and the trial was but a legal gesture to register a verdict already dictated by the press and the public opinion which it generated.

"Newspapers published as a fact, and attributed the information to the sheriff, that these defendants had confessed. No one, including the sheriff, repudiated the story. Witnesses and persons called as jurors said they had read or heard of this statement. However, no confession was offered at the trial. The only rational explanations for its nonproduction in court are that the story was false or that the confession was obtained under circumstances which made it inadmissible or its use inexpedient.

"If the prosecutor in the courtroom had told the jury that the accused had confessed but did not offer to prove the confession, the court would undoubtedly have declared a mistrial and cited the attorney for contempt. If a confession had been offered in court, the defendant would have had the right to be confronted by the persons who claimed to have witnessed it, to cross-examine them, and to contradict their testimony. If the court had allowed an involuntary confession to be placed before the jury, we would not hesitate to consider it a denial of due process of law and reverse. When such events take place in the courtroom, defendant's counsel can meet them with evidence, arguments, and requests for instructions, and can at least preserve his objections on the record.

"But neither counsel nor court can control the admission of evidence if unproven, and probably unprovable, 'confessions' are put before the jury by newspaper and radio. Rights of the

defendant to be confronted by witnesses against him and to cross-examine them are thereby circumvented. It is hard to imagine a more prejudicial influence than a press release by the officer of the court charged with defendants' custody stating that they had confessed, and here just such statement, unsworn to, unseen, uncross-examined and uncontradicted, was conveyed by the press to the jury.

"This Court has recently gone a long way to disable a trial judge from dealing with press interference with the trial process, *Craig* v. *Harney*, 331 U. S. 367; *Pennekamp* v. *Florida*, 328 U. S. 331; *Bridges* v. *California*, 314 U. S. 252, though it is to be noted that none of these cases involved a trial by jury. And the Court, by strict construction of an Act of Congress, has held not to be contemptuous any kind of interference unless it takes place in the immediate presence of the court, *Nye* v. *United States*, 313 U. S. 33, the last place where a well-calculated obstruction of justice would be attempted. Not doubt this trial judge felt helpless to give the accused any real protection against this out-of-court campaign to convict. But if freedoms of press are so abused as to make fair trial in the locality impossible, the judicial process must be protected by removing the trial to a forum beyond its probable influence. Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial. These convictions, accompanied by such events, do not meet any civilized conception of due process of law. That alone is sufficient, to my mind, to warrant reversal."

There are no easy solutions in the task of protecting both the freedom of the press and the right of a defendant to a fair and impartial trial. The two interests which must somehow be balanced have been described by Mr. Justice Frankfurter in his opinion in *Maryland* v. *Baltimore Radio Show Inc. et al.*, *supra*, as follows at p. 920: "One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right. On the other hand our society has set apart court and jury as the tribunal for determining guilt or innocence *on the basis of evidence adduced in court*, so far as it is humanly possible."

(Italics ours). This problem was recently explored in a thoughtful article by Jerome H. Spingarn entitled "Newspapers and the Pursuit of Justice" appearing in *The Saturday Review*, April 3, 1954, p. 9. After giving illustrations of the sensational and incriminating accounts of a pending case in the city of New York, Spingarn goes on to point out that "It will not be easy . . . to find jurors whose impartiality has not been violated. There are very few people in the city who have not read about the 'confession,' who do not know or think they know, every detail of the criminal act, who have not speculated on motives. And are there any who have not formed their opinions as to guilt, and have not even gone on to measure the mercy with which they might temper justice? . . . There is certainly nothing wrong about the publication of the news story itself. . . . But such reading before trial and conviction might be a luxury we can ill afford if we are at the same time to maintain our Constitutional guarantee that accused persons are to be presumed innocent until proven guilty and are to be tried before an impartial jury."

We have no way of knowing from the record before us to what extent, if any, the right of the defendant to a fair trial was impaired by the allegedly excessive publication of his confession. But the record does show that the representatives of the press were present *at the invitation of the district attorney* when the defendant confessed at San Antón. Under those circumstances the district attorney is more to be blamed than the newspapers which allegedly published the confession in detail prior to trial. "To have the prosecutor himself feed the press with evidence that no self-restraining press ought to publish in anticipation of a trial is to make the State itself through the prosecutor, who wields its power, a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice." Mr. Justice Frankfurter dissenting in

*Stroble* v. *California, supra*, p. 201. The remedy perhaps may lie in a policy under which the district attorney normally does not disclose confessions prior to trial. That policy, followed by many prosecutors, has been adopted in the city of New York. See Letter to the Editor, New York Times, April 21, 1954, in which the district attorney points out that, in refusing to disclose confessions prior to trial, his "sole purpose is to protect the right of a defendant to a fair trial by not disclosing, before trial, that he may have incriminated himself." He adds, by way of explanation, the following:

". . . It seems undeniable that widely disseminated information that a defendant has 'confessed' has the effect of convincing the general public that he is unquestionably guilty and that any trial will be a mere formality. To obtain an impartial jury under such circumstances, therefore, may be a most difficult task. In its practical effect such publication tends to destroy the presumption that an accused is innocent until he is proved guilty beyond a reasonable doubt in a court of law.

"The vice inherent in the situation stands out in bolder relief where the statement is never even received in evidence. Such a statement sometimes is excluded as not being a confession at all by a court ruling that duress preceded or accompanied it or that it was given under some inducement or promise of benefit; or that it resulted from some unfair psychological pressure;[45] or that the person was in such an unstable mental condition at the time as to preclude credence of any statement made by him. For these or similar reasons, indeed, the prosecutor himself may decide not to offer the statement in evidence at the trial."[46]

---

[45] That is exactly what occurred here. See Part III (*e*).

[46] The Maryland Court of Appeals goes even further. The policy of the district attorney of New York City is to announce that the defendant has made a statement but that he will not disclose its contents or characterize it as a confession. In *Grammer* v. *State, supra*, the court said at p. 261: "Officials of the State should not announce, or sanction the announcement, that an accused has confessed or that he has made a statement. The term statement includes those which are exculpatory in varying degree but to the public mind it has come to be an euphemism which does not deceive but connotes an admission of guilt."

It should hardly be necessary to add that the policy of non-disclosure of confessions prior to trial cuts both ways. Cases should be tried in the courts, not in the newspapers prior to trial. It follows that attorneys for defendants as well as prosecutors normally should forbear from releasing for publication evidence which they hope to present in court. Canon 20 of *Canons of Professional Ethics Governing the Conduct of Lawyers of Puerto Rico*, 48 P.R.R. XI, XVII, XVIII. A great newspaper recently expressed approval of this approach. Editorial, "Trial by Newspaper", New York Times, May 14, 1954. Other newspapers have taken a different view. *Time*, July 12, 1954, p. 38. After the testimony is presented at the trial, publication will not as a general rule violate any constitutional right of the defendant. *People* v. *Jelke*, 130 N.Y.S.(2) 662 (App. Div., 1954).[47]

---

[47] Spingarn, *supra*, discusses a different question at p. 62:

"The trial of an issue of fact in a courtroom can be a rather long process. It can be dull and tedious. Jurors will be inclined to lose the thread of the case from time to time, since the testimony often unfolds in a rather haphazard and nonchronological way. How welcome, then, is a news account, which in a few, terse, well-written words summarizes what is going on, picks out the highspots, illumines the significant points, and rearranges scattered facts into an understandable sequence. It is as helpful to the jury as a course outline is to a college student on the eve of exams.

"But how dangerous! It is written by a reporter who bears no responsibility to the Court, who has no training in weighing evidence, who is not required to be present throughout the trial, who has an imperative bias in favor of excitement.

"The law makes its own provision for a course outline: the summations of counsel and instructions of the judge. Around them it throws up several important safeguards—such as the one which permits counsel to sum up only what he has proved with evidence. Around the news there are no such safeguards. Yet the newspaper can penetrate more deeply into hours of relaxation, can appeal more emotionally than the judge."

This is a difficult problem to solve. The press cannot of course be prohibited or restricted from publishing such accounts. It is true that the jury may be instructed not to read or to disregard newspaper accounts of the trial. But outstanding judges have doubted the efficacy of such instructions in a notorious case. Memorandum of Mr. Justice Frankfurter in *Leviton* v. *United States*, *supra Krulewitch* v. *United States*, 336 U. S. 440, 453, concurring opinion of Mr. Justice Jackson; *Delaney* v. *United States*, *supra*, 112.

As already noted, we find no basis in the record before us for holding that any reversible error occurred in this case due to excessive publication of confessions of the defendant prior to trial. However, we have felt it desirable to call this question to the attention of the district attorneys and the Secretary of Justice, the bar, and the press. The whole problem of what has been called "trial by newspaper," is an acute one under modern conditions of mass communications. See Otterbourg, *Fair Trial and Free Press: A New Look in 1954*, 40 A.B.A.J. 838 (Oct., 1954); Phillips and McCoy, *Conduct of Judges and Lawyers, The Challenge of the Press*, pp. 154–87, and authorities cited therein; Thayer, *Legal Control of the Press, Trial by Newspaper*, pp. 488–97; McCoy, *The Judge and Courtroom Publicity*, 37 Am. Jud. Soc. J. 167 (April, 1954); Howard, *A Newspaper Editor Looks at Canon 35, id.*, 166. Only by mutual cooperation and understanding between attorneys and the press can both fundamental principles—the freedom of the press and the right of a defendant to a fair and impartial trial—be effectively preserved.

The judgment of the former district court will be reversed and the case remanded for a new trial.

---

MR. JUSTICE NEGRÓN FERNÁNDEZ, concurring.

"This case has its roots"—I wrote in the case of *Batalla* v. *District Court*, 74 P.R.R. 266, and I repeat herein—"in acts of abominable criminality which an offended society must repudiate with a righteous spirit of collective indignation. However, the case herein involves the alleged violation of fundamental rights of man in the basic guarantees established by laws which recognize those rights and under whose protection rests the incomparable magnificence of democracy in the free nations of the world. . . ."

In order to maintain unshaken the faith of the people in the justice of democracy, the State's authority in the adminis-

tration of criminal justice must be exercised in its fair proportions.

Even though I disagree—rather in the manner of expression—with some of the concepts set forth in the opinion of the Court and the concurring opinion of Mr. Justice Sifre, I am in accord with the essence and basic sense of those concepts, and of course, with the juridical doctrine laid down.

I wish to state—as does the Chief Justice in the opinion of the Court—in recognition of the professional integrity of the prosecuting attorney in the instant case, that the absence of clear jurisprudential doctrines in some of the points involved herein, as well as the brutality of the crime investigated, offered a propitious field where the zeal displayed by the prosecuting attorney in the fulfillment of his duty rendered less notorious the omission incurred.

MR. JUSTICE SIFRE, with whom MR. CHIEF JUSTICE SNYDER and MR. JUSTICE MARRERO and MR. JUSTICE BELAVAL join, concurring.

An examination of the record leads us to the inevitable conclusion that in this case errors were committed which because of their significance and serious implications have imposed on the Court the inescapable duty of reversing the judgment, notwithstanding the cruel nature of the loathsome crime charged against appellant. The requirement of the due process of law demands clear standards of law for the protection of all men, good or bad, guilty or innocent. Said guaranty "is the product of a civilization which, by respecting the dignity even of the least worthy citizen, raises the stature of all of us and builds an atmosphere of trust and confidence . . . ." [1]

What precedent would the Court have established if it had affirmed the judgment appealed from? That a person

---

[1] Dissenting opinion of Mr. Justice Douglas in *Stein* v. *New York*, 346 U. S. 156.

may be illegally detained and kept in that situation for three whole days; that he may be taken, while in that state of illegal detention, to a cemetery to confront him with the spectacle of the exhumation of the corpse of his alleged victim, asking him to identify it, although it was unnecessary, which spectacle provokes in him a nervous reaction, confusion and trembling; that he may be taken back to the place of his detention to wait until the authorities obtain evidence which, in their opinion, warrants a charge of murder; that he may then be submitted to a relentless, and even to a certain extent torturing, interrogation, not necessarily because of its duration but because of its nature —Exhibit A of the defense—accusing him on the one hand of having committed the crime, and on the other, pressing him again and again to answer incriminating questions; telling him that he must answer; placing him, because of the nature and method of the interrogation, in a position that even with his silence the impression is left that he is guilty; that he may be kept absolutely incommunicado, except for prosecuting attorneys and police officers, and wholly unprotected, without the aid and advice of his relatives and friends, denying him the assistance of counsel, until after he has confessed; and that said confession is not inadmissible against the person detained as a matter of law.

The Court has refused to establish that precedent, and decides that a confession obtained under the above circumstances bears the stigma of involuntariness. It has been so decided in an opinion delivered by Mr. Chief Justice Snyder, with which I am entirely in accord. I believe that it will play a most significant role in preserving procedural standards, without which it would be impossible to enjoy a clear and equitable judicial system.

I need not discuss the judicial precedents on which this Court bases its conclusion, because they are clearly and broadly stated in the Court's opinion. However, I must refer, although briefly, to some decisions which are pertinent to

the question which has been decided in connection with the confession made by appellant on the night of October 9, and the early hours of October 10, 1950. Exhibit 48 of the People.

I have read with deep interest the majority opinion in *Stein* v. *New York*, 346 U. S. 156. There it was maintained that two of the defendants had confessed under coercion or physical or psychological pressure. There was no convincing evidence as to the former. With respect to the latter, the opinion reveals that the suspects, being illegally detained, were submitted to long and exhaustive interrogations by a relay of officers all at once, and by several of them during different periods of time. The interrogations preceding the confessions are not set forth in the opinion. Apparently they were not put in writing, remaining in the dark secret which generally envelops interrogations of that nature.

That is not the situation in this case. The interrogation to which appellant was submitted preceding his confession appears in Exhibit A of the defense. Its nature, together with appellant's illegal detention, his being kept incommunicado and unprotected, the fact that he was denied the aid of counsel, above all in the crucial moment when he was accused of murder, his being insistently and relentlessly pressed to answer questions which were obviously incriminating, in an interrogation solely and exclusively directed towards obtaining from him an admission of guilt, are circumstances which, when considered as a whole, permit us to say with assurance that there is a marked difference between the two cases. There are two additional circumstances reaffirming this criterion. Cooper, one of the two defendants in the *Stein* case, named his own terms for confession. Stein, another of the defendants, upon knowing that Cooper had already confessed, stated to a policeman that if he, Stein, "must go" undoubtedly referring to the fact that if he would have to pay for his crime with his life, "I will take him with me" referring to Cooper, and then he confessed.

The decision in *Stein* v. *New York, supra,* does not overrule the doctrine that a confession has to be voluntary in the sense that it must be the expression of defendant's free choice, nor the principle that "To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process." *Watts* v. *Indiana,* 338 U. S. 49; *Harris* v. *South Carolina,* 338 U. S. 68. Certainly, the confession does not have to be made with the same spontaneity as a penitent confesses his sins, to a priest, the client his faults and mistakes to his lawyer, the patient his phobias and abnormalities to the psychiatrist, *Stein* v. *New York, supra,* but undoubtedly it has to be spontaneous in the sense that I have just stated. The confession made by appellant, Exhibit 48 of the People, does not represent a free act of his will.

Mr. Justice Ortiz in his dissenting opinion states that the effect of this Court's opinion "could be that of establishing standards of excessive pulchritude on the part of the prosecuting attorneys with respect to criminals," adding that he believes "in the purity of proceedings, but not to an extent so refined and excessive as to render practically impossible the investigation of crimes." I disagree with the opinion of my learned colleague. The Court merely reaffirms standards and principles which are perfectly well settled, which are not nor have been considered excessive, in order to secure a sound administration of criminal justice, and in so doing it complies with the lofty mission of seeing to their observance and obedience. Otherwise, the guaranty of the due process, a bulwark that prevents a free and modern society from degenerating into a society enslaved by judicial tyranny, would become illusory. There is no fear that those standards "render practically impossible the investigation of crimes." Furthermore, "under our system, society carries the burden of proving its charge against the accused not out of his own mouth. It must

establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured . . . . 'The law will not suffer a prisoner to be made . . . the instrument of his own conviction. 2 Hawkins, *Pleas of the Crown*, C. 46 § 34 (8th ed., 1824),'" *Watts* v. *Indiana, supra.* This, of course, does not mean that within certain limitations a person suspected of a crime may not be interrogated.

If there were reason for the fear expressed by Mr. Justice Ortiz, and I do not believe there is, undoubtedly it is preferable to suffer the evil that some crimes may go unpunished, than the calamity that an entire people lose the guaranty and rights protecting the individual liberties, without which a democratic society such as ours cannot subsist.

The court does not rest on technicalities in stating that the confession, Exhibit 48, is involuntary as a matter of law. It reaffirms eminently fundamental principles and recognizes that there can be no justice, despite the existence of sound laws, if the proceedings to enforce them are vicious.

Denial of due process in a criminal cause "is the failure to observe that fundamental fairness essential to the very concept of justice," *Lisenba* v. *California*, 314 U. S. 219, and it does not secure a greater effectiveness in the investigation and punishment of criminal acts. In his concurring opinion in *Malinski* v. *New York*, 324 U. S. 401, Mr. Justice Frankfurter refers to the following paragraph of a report issued by a committee of prominent attorneys who studied this problem : "The remedy for the ills which affect the administration of criminal justice, . . . will not be found in measures which violate law. Such expedients, so far from restoring health and vigor to the system, only aggravate and protract the disorder."

Mr. Justice Ortiz states that "the excessive protection of the personal integrity of a criminal may result in a system endangering the personal integrity of the rest of the individuals who constitute society." Appellant is not being

given excessive protection. He is being assured of the rights granted by our laws to all men, *not* because of softness or tenderness for the accused, *but because* they are essential "to the very concept of justice," proof that "we have reached a certain stage of civilization."[2] I do not believe that "The content of an individual right must vary according to the rights of the other citizens." The essential guarantees for the due protection of individual rights are not and cannot be elastic. The right to an impartial and fair trial may not be fragmented. If this were done, we would find ourselves in a true chaos as to the standards which should be observed in the very serious process of imparting justice, denying to many the equal protection of the law, and sliding on more than one occassion into a true judicial tyranny.

It is impossible for me to share the view that "there is nothing precise, systematic and exact as to what should be a 'due process of law.'" Much has been said about it. For example, the principle is firmly established that said requirement is violated if an involuntary confession is used to secure defendant's conviction and it is likewise well settled that it must be excluded "to prevent fundamental unfairness in the use of evidence." *Lisenba* v. *California, supra.*

Mr. Justice Ortiz states that "the meaning of those rights must not be so generously broadened by judicial interpretation as to draw an immunity curtain around the defendants and put up a bulwark against the investigation and prosecution of the crime . . . ." The Court is not doing this by refusing to accept in our system of administering criminal justice, proceedings contrary to the laws governing them, and which, instead of enhancing said system, would undermine it to the extent of reducing it to death. In this case proof is found that we are not establishing "a bulwark against the investigation of the crime" by reaffirming the doctrine that the confession, to be admissible against the accused, must be a

---

[2] See the dissenting opinion of Mr. Justice Frankfurter in *Stein* v. *New York, supra.*

voluntary confession. On the night of October 9, when the prosecuting attorney began questioning the suspect, he had in his possession, because of his efforts and diligence, sufficient evidence to prosecute him.

I am not impressed by the argument that the evidence showed the trustworthiness of statements made by the appellant in the written confession. The Court answers it in perfectly clear terms, invoking the doctrine clearly established by judicial precedents that the use of involuntary confessions is prohibited even if the statements are true. To hold the opposite would mean to give carte blanche to procure them notwithstanding the means. Nor am I convinced by the argument wielded that the appellant is "an intelligent, educated and mature man with experience of life . . ." and that he defended his rights with energy. If he is guilty of the offense charged I have very serious doubts that he possesses those qualities. Experience has shown us that crime does not pay and the general rule is that sooner or later it is punished. Furthermore, although it is positively true that upon considering the voluntariness of a confession the degree of intellectual development, the greater or lesser maturity and the greater or lesser experience of the defendant are valuable, that is not necessarily controlling in either sense. History shows that men who were truly mature, cultured, intelligent, experienced, and with the moral fortitude afforded by the faith in doctrines and principles which are defended throughout life, could not resist the physical or psychological coercion, and succumbed because their wills had been broken or overwhelmed.

It is true that appellant defended himself forcefully, but it is nonetheless true that finally and during the course of the interrogation to which he was submitted during the evening of October 9 and the early hours of October 10, this energy turned into complete and absolute meekness, as a result of the psychological coercion which, as a matter of law, branded his written confession as involuntary. Exhibit 48.

The court has taken notice of the error committed by the trial court upon instructing the jury on the confessions. This is not the first time that such a thing has happened, even without taking exception or pointing out the error. The error in the case at bar is too serious to let it pass unnoticed. The jury had no orientation whatsoever regarding the principles and factors which it should consider in determining whether or not the confessions were voluntary.

I regret that time does not allow me to discuss the error committed in inverting the order of the presentation and admission of the confessions, which resulted in having the jury hear the evidence regarding the San Antón confesssion before deciding on the admissibility of the previous confession, Exhibit 48, and in my opinion, with great prejudice to the appellant. I likewise regret that it is not possible for me to discuss the error also committed by the trial court in admitting the statements made by the counsel for appellant in the habeas corpus proceeding, as a pertinent proof to show that the confessions had been voluntary, an extremely serious error for several reasons, and indefensible under any principle until now known.

I am deeply convinced that the appellant was not tried according to the due process of law, and that by affirming the judgment we would have established a truly unfortunate precedent of sanctioning the abuse of rights which this Court has the inescapable duty to protect; I am also absolutely convinced that the opinion reversing said judgment establishes with clarity and precision procedural standards which should contribute considerably to the enhancement, development and progress of the administration of criminal justice in our country.

---

MR. JUSTICE PÉREZ PIMENTEL concurring in the result.

In my opinion the error committed by the trial court in instructing the jury as to the confessions of the defendant warrants the setting aside of the verdict rendered, the

reversal of the judgment appealed from and the granting of a new trial to the defendant. However, and for the reasons set forth in the dissenting opinion delivered by Mr. Justice Ortiz, I do not believe that defendant's written confession, included in Exhibit 48 of the People, was involuntary "as a matter of law". In that sense I disagree with the view of the majority opinion as set forth in the lengthy opinion delivered by Mr. Chief Justice Snyder. This notwithstanding, I concur in the result reached in said opinion.

MR. JUSTICE ORTIZ, dissenting.

The opinion of this Court contains an excellent discussion of all the problems and points of view involved in this appeal. Its excellence is manifested through the objective and efficient manner in which all the authorities and the judicial precedents relevant to the decision of this case are fully set forth. There is no margin for the search for additional precedents. But precisely on the basis of the study made in the majority opinion I feel compelled to dissent from the conclusions set forth by this Court, from its final decision and from the results which are the consequence of that opinion.

I am convinced that the confession made by the defendant on the night of October 9–10, 1950, far from being absolutely and as a matter of law involuntary, was voluntary, because it was a genuine expression of defendant's will and mind, without being the result of any coercion whatsoever, whether physical or psychological. The defendant, an intelligent and educated man, mature, shrewd, always on the alert and always well aware of his rights, was submitted to a persistent examination for a period of six hours by a single person, the prosecuting attorney, and finally he confessed. It in nowise appears from the record that upon confessing, the defendant's will had been overwhelmed or that he had lost control of his mental faculties or that his intellectual free-

dom had been impaired, or his mental resistance overpowered by any kind of coercion. In order to justify the conclusion reached by this Court to the effect that the confession was involuntary uncontrovertedly and as a matter of law, it must be established that the interrogation was of such a nature, and the atmosphere and circumstances surrounding the defendant were such that his confession was involuntary, that is, that it was not the action of his will in the sense that his mental freedom had been unduly overpowered and his mental resistance overwhelmed. Thus, the only relevant investigation of the question at issue is whether or not the confession was voluntary and not whether or not the prosecuting attorney acted improperly, without affecting the voluntariness of the confession, or whether his questions were not reasonable or within fair play because they were aggressive. We must not forget that a jury, as a court which decided the facts, found defendant guilty; that it considered the question of fact concerning the voluntariness of the confession under instruction of the judge; that it considered all the circumstances concerning the form and manner in which said confession had been made, and, since it found the defendant guilty, it must be presumed that it also determined the voluntary nature of the confession. We are now setting aside a finding of fact made by the jury. Of course, the only way we could do it would be by holding, as this Court does, that the confession inherently, automatically, as a question of law and not of fact, inexorably and uncontrovertedly, was involuntary. I cannot accept that criterion. Anticipating a more elaborate, subsequent discussion, the voluntariness of the confession was buttressed by several subsequent facts, to wit: that the defendant himself, at the trial, adopted and ratified the truth, validity and authenticity of the confession by accepting the facts set forth therein and using them as a basis for his theory of defense, thereby curing the confession of any possible defect; that a counsel

for the defendant, speaking for him, admitted that the confession had been voluntary and that defendant himself, several hours after having made the confession in question, made a second confession which this Court admits was valid and voluntary, in which he tranquilly and calmly confessed the crime, with abundance of details, said second confession having cured any possible defect in the first, and the jury having been able to use that second confession to convict the defendant, and finally, we must also consider that there was independent proof, aside from the confession in question, which justified a verdict of guilty.

In view of the circumstances enumerated, I believe that to set aside the verdict of guilty and the corresponding judgment is contrary to the realities and the intrinsic justice of this specific case. I am particularly concerned with the fact that the effect of this Court's opinion with respect to the intensity of defendant's interrogation, not desired, naturally, by this Court, may be that of destroying fully the effectiveness of criminal investigations in Puerto Rico, manacling the prosecuting attorneys and preventing them from properly interrogating suspects. The result of this Court's opinion, although not contemplated by the judges of the majority, could be that of establishing standards of excessive pulchritude on the part of the prosecuting attorneys with respect to criminals. Naturally, I believe in the purity of proceedings, but not to an extent so refined and excessive as to render practically impossible the investigation of crimes. I do not believe in the mailed fist or in the ordeal by fire for suspected criminals, but neither do I believe in excessive tenderness. I do not believe in inquisition, but neither do I, nor my colleagues, believe in a paradise for criminals. I do not believe in totalitarianism, but I believe that a democracy can and must have efficient prosecuting attorneys. As said on previous occasions, the prosecuting attorney should not sit in front of his house, like the Arab,

and wait for his enemies to go by. This is not the result desired by this Court but, in my judgment, it could be the effect of the opinion.

Naturally, I have spoken in terms of extreme categories and neither the undersigned nor the distinguished magistrates of the majority in the instant case have assumed extreme positions. There should be no absolute and rigid principles, and the differences in degrees should be exhibited according to the special circumstances of each case. I believe that the circumstances of this specific case do not warrant this Court to approach the verge, even without intention, of rendering useless the power of investigation of the prosecuting attorneys. The question of the voluntariness of confessions is an aspect of the eternal problem concerning the contrast between individual rights and social interests, between extreme romantic individualism and basic social needs. In speaking of social rights I am not referring to society as an intangible concept divorced from reality. I mean that the greatest individualism is that of the greatest possible number of individuals, that the broadest form of freedom is the individual freedom of the majority of the persons who constitute society. From that point of view the excessive protection of the personal integrity of a criminal may result in a system endangering the personal integrity of the rest of the individuals who constitute society. I understand that it is the function of a Constitution, and of this Court, to protect the constitutional rights of any citizen, or group of citizens, even if they are a minority of the population. The rights of the minority should be protected, even if they are a group of suspected criminals. But what I mean to say is that those rights are not absolute; that they do not belong in the vacuum of intellectual abstraction. The content of an individual right ought to vary in conformance with the rights of the other citizens. A defendant is entitled to due process of law and should be protected against

self incrimination. But there is nothing precise, systematic and exact as to what "due process of law" should be. Although not contemplated by this Court in the instant case, the meaning of those rights must not be so generously broadened by judicial interpretation as to draw an immunity curtain around the defendants and put up a bulwark against the investigation and prosecution of the crime, in prejudice of the personal safety of the rest of the individuals. That, as a matter of general doctrine. Up to what point the protection of the defendant's rights and the protection of the legitimate functions of public servants whose duty is to defend society should be extended depends on the circumstances of each case. It is important that judicial investigation be objective and realistic, devoid of either a passion for civil rights or a passion for social rights; the result should emerge unaffected by a passion born of the more or less cruel or horrifying circumstances of the specific crime before the Court, or by that other passion, the product of a sense of indignation aroused by the prosecuting attorney's methods, which can be unfair and scarcely reasonable, but which as a matter of reality do not fall within the category of coercion.

The time has come for me to descend from the clouds of intellectual speculation and consider the specific circumstances of this case. I have merely wished to create a perspective of objectiveness, fully aware of the individual rights of the defendant and the social interest in pursuing criminality legitimately and effectively. Now that we have developed such orientation, we shall consider some of the aspects of the confession made on October 9–10, 1950.

Prior to the confession, defendant had been illegally detained for several days, without warrant of arrest, without having been taken before a magistrate and without having been allowed to consult an attorney or his friends. I repudiate that action which kindles our minds with indignation. But the question we are investigating is not whether that

procedure should be punished by the acquittal of the defendant. What we must determine is whether the confession was voluntary or involuntary. If, notwithstanding the illegality of the proceeding, the confession was inherently voluntary, it does not artificially become involuntary because the procedure did not conform to the Code of Criminal Procedure. As stated in the opinion of this Court, the fact itself that the arrest had been illegal does not imply that the confession was involuntary. This has been established by the Supreme Court of the United States in recent cases. *Gallegos* v. *Nebraska*, 342 U. S. 55, 60; *Stein* v. *New York*, 346 U. S. 156. Analytically, said ruling is correct. The exact question for determination as to the involuntariness of the confession because of psychological coercion refers to whether specific pressure imposed on the declarant impairs his mental resistance, his free choice and his mental faculties in such a way that the confession made is not a spontaneous product of his will. Two factors are relevant, the magnitude of the pressure exerted and the personality of the one under pressure, with respect to his maturity, education and intellectual fortitude. The detention itself may constitute a sort of pressure, but the impairment of the will of the suspect is not an inevitable consequence. Detention may be a prelude of "third degree" methods, but it may well happen that the detention is not accompanied by any such methods. Illegal detention may be a relevant circumstance in ascertaining whether there has been any psychological coercion, but the operative factor is the determination of the effect of the detention on the mental process and will of the suspect. Such circumstance loses all significance and relevance when it is proved, as in the case at bar, that notwithstanding the illegal detention, the defendant was in the full and complete possession of his mental faculties when he confessed. As appears from the summary of the occurrences set forth in the opinion of this Court, when the interrogation was begun

on the night of October 9, and as it continued, the defendant was obviously mentally alert and with a full understanding of his rights. There is no sign whatsoever that he was in any way mentally exhausted nor does the record reveal that he experienced the slightest mental weakness. He proved to be, throughout the whole interrogation, intelligent, smart, shrewd and energetic in the defense of his interests. He confessed spontaneously in the free and conscious exercise of his will.

There may be cases where the detention is surrounded by circumstances giving rise to the inference that the will of the person detained has been impaired, such as the lack of food, sleep and rest. Such circumstances undoubtedly affect the body and physical condition of the person detained and therefore his mind and his will. Precisely, the U. S. Supreme Court has held that the illegal detention constitutes a significant circumstance to show that there has been coercion when the person detained has not been allowed to sleep, rest and take food for a prolonged period of time before confessing. *Watts* v. *Indiana*, 338 U. S. 49, 51, 52. But in other cases where the detention has been illegal, but the defendant has had adequate opportunity to satisfy the rudimentary needs of life, it has been held that the confession is voluntary notwithstanding the illegal detention. *Gallegos* v. *Nebraska, supra; Stein* v. *New York, supra.* In the case at bar, from the summary of the occurrences set forth in the opinion of this Court it appears that at all times during his detention prior to the interrogation which gave rise to the confession, Fournier relaxed, slept and had the kind of food he wanted, whenever he wished. Therefore, there are absolutely no grounds for inferring that the illegal detention would have even tended to produce an involuntary confession. In view of the foregoing, that the illegal detention did not weaken, as a matter of fact, Fournier's will, and that the circumstances which surrounded the detention in no way

impaired his physical and mental condition, the illegal detention lacks all significance and relevancy in the investigation of the issue before us, the voluntariness of the confession. Therefore, it must be completely excluded as a pertinent circumstance, either isolatedly or in connection with the interrogation, since, when the time for interrogation came, the illegal detention had not affected Fournier at all. The majority opinion indicates that the fact itself of the detention, without being allowed to talk to counsel, friends or relatives, could have produced a certain psychological reaction on the part of Fournier, of submission to the authority of the prosecuting attorney and other officials and of desiring to confess in order to put an end to that situation. But the very opinion of this Court reveals that as a matter of specific reality, the detention did not affect Fournier's will, and, therefore, any possible presumption or inference to the contrary has been rebutted. There is not the slightest sign that Fournier confessed because he considered himself improperly subjected to the will of the prosecuting attorney or because he wished to get away from his illegal detention. The fact that he complained of his detention does not mean that he confessed because of it. His protestation precisely disclose the opposite, an attitude, not of submission and weakness, but of energetic resistance. The force of his allegations showed his complete control over his will.

In brief, there are grounds for moral indignation against Fournier's detention. But that noble passion must not lead us to hold that the confession was involuntary, when actually and as a matter of fact it was voluntary. The officers responsible should be punished in some other way which is not inconsistent with the specific reality of the facts as they occurred. The public morality may be secured through those other penalties but not through the reversal of the judgment on the basis of the involuntariness of a confession which was actually voluntary. I want to make clear that

I am convinced that it was not the intention of the majority of the Court in the instant case to transform the reality of the concepts on the basis of indignation. As I stated before, the majority opinion is worded in objective and serene terms, but the result justifies the general remarks I have expressed, as a matter of general doctrine, and not as a criticism of the elevated language in which the opinion of the Court is written.

I turn now to consider the nature of the interrogation to which Fournier was submitted on the night of October 9, 1950, in order to determine whether said interrogation constituted psychological coercion, that is, whether it weakened Fournier's will in such a manner that his confession was involuntarily given. As stated in the opinion of this Court, the fact itself that an interrogation is persistent, aggressive, relentless and reasonably continuous does not imply that the confession was involuntary. That was precisely what happened in the instant case. The interrogation lasted only six hours while Fournier was in a completely adequate mental attitude, with full intellectual freedom, mentally alert, conscious of his rights, after having slept, rested and taken food, being a mature man, educated, intelligent, with experience of life and with ample knowledge, of his rights and of his special position in this case. The interrogation was conducted by a single person, the prosecuting attorney, Viera Martínez, and not by a continuous relay of prosecutors, each with a clear mind as against the weary mind of the suspect. As stated in the opinion of this Court, Viera Martínez himself was more fatigued and had less sleep than Fournier, and from that point of view, Fournier enjoyed a physical and mental advantage. It is clear that there were no "third degree" methods; there was no violence or physical torture, nor a flood of lights continuously over the face of the defendant. Viera Martínez never threatened the defendant nor made promises of any kind. There were no subtle methods of tor-

ture or coercion. As to the time element, a large part of the six hours was dedicated to irrelevant questions which had nothing to do with the case. It is probable that the interrogation on the case itself lasted less than three hours. What remains then is an unremitting and relentless interrogation which, as has been established by the jurisprudence, does not render the confession involuntary. It was merely the case of an intellectual duel between two alert minds, Fournier finally deciding to confess. It does not transpire from the record that when Fournier made up his mind to confess he was weary and his will weakened. At most it can only be inferred that because of the relentlessness of the interrogation his will became shaken. But the established rule is precisely the opposite, that persistence in the interrogation does not result in involuntariness. Fournier did not testify at the trial and there was no direct evidence of any kind, either from Fournier's own lips or from any other source, as to the effect of the interrogation on Fournier's will. Naturally, Fournier had the right to remain silent. But the Supreme Court of the United States stated the following in the case of *Stein* v. *New York, supra,* on page 177, upon referring to the silence of the defendant as regards the voluntariness of the confession:

"In trial of a coercion issue, as of every other issue, when the prosecution has made a case to go to the jury, an accused must choose between the disadvantage from silence and that from testifying. The Constitution safeguards the right of a defendant to remain silent; it does not assure him that he may remain silent and still enjoy the advantages that might have resulted from testifying."

That is, that it is legitimate to state that defendant's silence was no proof that his will was "dead" as a result of the interrogation.

This Court holds that, "as matter of law", the confession of the night of October 9–10 was involuntary. In the absence of specific proof on the concrete effect of the questions upon

the defendant's intellect and will, the judgment of this Court implies the view that, from the nature of the questions asked, there arises inexorably the involuntariness of the confession. I do not agree with that view. But before going into some of the details of the interrogation, it is well to notice that one of the essential factors in determining whether or not a confession is voluntary consists in the personality of the defendant. Fournier was not a young, ignorant, timid or illiterate boy. He was, and is, a mature, educated and intelligent businessman, aggressive in the defense of his interests. With that personality, it is much more difficult to show that the interrogation shook down his will and overpowered his mind to the extent of rendering the confession involuntary. On the other hand, we must bear in mind that it is the duty of prosecuting attorneys to investigate and that a very important part of that investigation is the defendant's interrogation. The defendant is the person best fitted to know the facts, to prove his innocence if he is innocent, and to explain the proof that the prosecuting attorney may have been able to obtain. The defendant has the right to refuse to testify, but that does not preclude the prosecuting attorney from questioning him and from trying to procure a statement in legal form. The common experience is that the interrogation may not always be carried out effectively in a cordial and friendly conversation. The prosecuting attorney very often has to be aggressive, without violence or intimidation, and a particularly effective method is that of confronting the defendant with the evidence already obtained, in order for him to explain it. All of that is part of the routine of investigation, and that is why it has been held that the fact itself of a persistent interrogation does not imply that the confession procured has been involuntary. In *Stein* v. *New York, supra,* the Supreme Court of the United States, speaking through Mr. Justice Jackson stated the following at page 184:

"Psychological coercion is claimed as a secondary contention. It is urged that admitted facts show psychological pressure by

interrogation, such as to overpower these petitioners' mental resistance and induce involuntary confessions. Of course, a process of interrogation can be so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession.

"But the inquiry as to such allegations has a different point of departure. Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not. By their own answers many suspects clear themselves, and the information they give frequently points out another who is guilty. Indeed, interrogation of those who know something about the facts is the chief means to solution of crime. The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness. This Court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and not coercive.

"Of course, such inquiries have limits. But the limits are not defined merely by calling an interrogation an 'inquisition', which adds to the problem only the emotions inherited from medieval experience. The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.

"Both Stein and Cooper confessed only after about twelve hours of intermittent questioning. In each case this was stretched out over a 32-hour period, with the suspect sleeping and eating in the interim ... . It also is true that the questioning was by a number of officers at a time and by different officers at different times. But we cannot say that the use of successive officers to question these petitioners for the periods of time indicated is so oppressive as to overwhelm powers of resistance. While we have reversed convictions founded on confessions secured through interrogations by 'relays', we have also sustained convictions when, under different circumstances, the relay technique was employed. But we have never gone so far as to hold that the Fourteenth Amendment requires a one-to-one ratio between interrogators and prisoners, or that extensive

questioning of a prisoner automatically makes the evidence he gives in response constitutionally prohibited.

"The inward consciousness of having committed a murder and a robbery and of being confronted with evidence of guilt which they could neither deny nor explain seems enough to account for the confessions here. These men were not young, soft, ignorant or timid. They were not inexperienced in the ways of crime or its detection, nor were they dumb as to their rights. At the very end of his interrogation, the spectacle of Cooper naming his own terms for confession, deciding for himself with whom he would negotiate, getting what he wanted as a consideration for telling what he knew, reduces to absurdity his present claim that he was coerced into confession. Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.

"Cooper's and Stein's confessions obviously came when they were convinced that their dance was over and the time had come to pay the fiddler . . . . Both confessions were 'voluntary', in the only sense in which confessions to the police by one under arrest and suspicion ever are. The state courts could properly find an absence of psychological coercion."

We shall now consider some of the facts which characterized the interrogation. Among other things, the prosecuting attorney told the defendant that he had no right to consult or be aided by counsel at that stage of the proceeding. The prosecuting attorney was not guilty of a falsehood. As stated in the majority opinion, this Court has held that the defendant is not entitled to the aid of counsel during the course of an investigation. But even assuming that the prosecuting attorney had informed the defendant incorrectly as to the state of the law, that does not imply that the confession was involuntary or that it had been secured through psychological coercion. I do not believe that the statements of the prosecuting attorney were deceptive or tricky, but even assuming that they were, it is a well-settled rule that a confession does not become involuntary because of the fact that it has been obtained by fraud or deceit, no matter how cen-

surable such practices may be. 3 Wigmore 281, § 841, third edition and cases cited therein, and see to the same effect *Pueblo* v. *Alméstica*, 18 P.R.R. 314. This rule illustrates the contrast that should always be noticed between the fact that the method employed may be highly censurable, and the fact, altogether different, that the confession may be really involuntary. It is already well established that illegality in the methods of obtaining a confession does not necessarily imply that it is involuntary, inasmuch as such illegality does not mean, per se, that the confession lacks credit. 3 Wigmore 249, § 823, third edition. The fact that the defendant is informed that he is not entitled to be assisted by counsel during the interrogation does not mean that the mental resistance of the defendant has been impaired to the extent that he deliberately makes a false confession to stop the questioning. In any event, the defendant did not believe the statement of the prosecuting attorney and always insisted that he was entitled to consult an attorney.

The prosecuting attorney told the defendant on several occasions, and erroneously, that he was compelled to answer. The prosecuting attorney, more or less, said the following phrases: "You have to answer . . . I ask the question and so many minutes pass without the defendant answering, etc." That method of questioning, alone, is censurable but it does not transpire from the whole interrogation that such methods or such statements had any effect on the mind or the will of the defendant. Contrariwise, it affirmatively appears from the interrogation that the defendant always rejected energetically such statements by the prosecuting attorney and that he was always well aware of his right to remain silent. Defendant's confession was not due to the fact that he was convinced that he was not really entitled to remain silent.

Although the situation is different, by analogy, in 3 Wigmore 263, § 832, there is discussed the problem of the statement made to the defendant during questioning that he should or must tell the truth. The following is stated:

"On principle, the advice by any person whatever that it would be better to tell the truth cannot possibly vitiate the confession, since by hypothesis the worst that it can evoke is the truth, and there is thus no risk of accepting a false confession. The confessor is not obliged to choose between silence and a false confession having powerful advantages; the advantages are attached to the utterance of the truth; and, however tempting we may suppose them to be, there is nothing in the nature of the temptation to make the statement untrustworthy; for if it has availed at all, it has availed to bring out the truth.

"Nevertheless, judges have been found with such extraordinary scrupulosity as to exclude confessions following such advice. The practical result under such rulings is a false and artificial interpretation, justly reproved by Mr. Justice Willes: 'It seems to have been supposed at one time that saying "tell the truth" meant in effect "tell a lie." ' Sound opinion refuses to exclude a confession induced by such exhortation; and the weight of authority in this country, though not in England, repudiates such an exclusion."

The opinion of this Court emphasizes the fact that the defendant was confronted with certain evidence of a repulsive, horrible, dreadful and shocking nature obtained by the prosecuting attorney and that it was an important factor in establishing psychological coercion. But according to the theory of the defense of the accused and according to the confession at San Antón, defendant not only knew of that evidence prior to the confession of the night of October 9, but he himself created that evidence by his own actions which he subsequently admitted in an undoubtedly voluntary manner. He could feel no repulsion or horror when he himself created the horror. His will could not have been overwhelmed by certain horrifying objects which he had already seen, and which had become horrible because of his own actions and of the previous exercise of his own will. I do not believe that the judgment should be reversed or that the confession should be branded as involuntary merely because the defendant was asked to explain the proof which he himself had produced and with which he had been in contact. If the defendant had not

been shocked before, there is no reason for saying that he was shocked afterwards, unless it is said that he suffered a disturbance upon learning that his crime and his actions had been discovered. But such disturbance does not constitute the overwhelming of the will required for excluding a confession. Precisely it has been stated and held that confronting the defendant with the evidence constitutes the most legitimate and effective explanation for defendant's confession, without it being involuntary. In the *Stein* case it was held, on June 15, 1953, that the confession of Stein and Cooper had been made not because of the illegal detention or the prolonged interrogation, but because the defendants had been confronted with the evidence and that, therefore, the confession was voluntary because they were convinced that "their dance was over and the time had come to pay the fiddler". On that particular the following is stated in 3 Wigmore 319, § 851:

"In the first place, an innocent person is always helped by an early opportunity to tell his whole story; hundreds of suspected persons every day are set free because their story thus told bears the marks of truth. Moreover, and more important, every guilty person is almost always ready and desirous to confess, as soon as *he is detected* and arrested. This psychological truth well known, to all criminal trial judges, seems to be ignored by some Supreme Courts. The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; *and when detection comes,* the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. *To forbid soliciting him,* to seek to prevent this relief, *is to fly in the face of human nature.* It is natural, and should be lawful, to take his confession at that moment—*the best one.* And this expedient, if sanctioned, saves the State a delay and expense in convicting him after he has reacted from his first sensations, has yielded to his friends' solicitations, and comes under the sway of the natural human instinct to struggle to save himself by the aid of all technicalities." (Italics ours).

In the instant case defendant realized that he had been detected when he was confronted with the evidence. Hence,

his natural impulse to tell the truth voluntarily and not by coercion.

It is difficult for the prosecuting attorneys in many cases to obtain or detect the evidence. Once secured and detected, one of the most effective methods in the solution and prosecution of crimes consists in confronting with that evidence, a suspect who refuses to talk. If the suspected person is really innocent, judging by the natural human reactions, said evidence would not affect him, no matter how shocking, since he has not participated in the creation of that horror, nor would he be affected in learning that the prosecuting attorney possesses such evidence. At most, he might experience a disagreeable sensation of disgust and repulsion because of the intrinsic nature of the evidence but it would not affect an innocent person to the extent of producing a false confession in order to prevent a further exposure of evidence with which he has had nothing to do. But if the truly guilty person is confronted with such evidence he may very well have the natural and voluntary impulse to confess, either because he realizes that he has been detected and that "his dance is over", any further evasion being useless, or because of the remorse of a guilty conscience which has been stimulated by the direct display of the objects surrounding his crime. This is the realistic and psychological point of view as to this situation. But if a mechanical rule of exclusion of confessions is established because the defendant has been confronted with the evidence, which in the majority of murders is necessarily horrifying, then an effective means of solving crimes would be destroyed.

Generally speaking, it is a well-settled principle that the basis and foundation of the rule of exclusion of involuntary confessions is that a certain pressure or specific actions which induce to confession create a substantial risk that such confessions are false and untrustworthy. 3 Wigmore 246, 248, §§ 822, 823. This does not mean that a defendant may challenge the voluntariness of a confession by his attempt to

show that the content of the confession is false. It means that the concept itself of the involuntariness arises from those external circumstances giving rise to the probability that the confession is false. Now, I have meditated extensively on this problem and, although I may reach the conclusion that the prosecuting attorney was not altogether correct, I cannot reach the conclusion that the circumstances surrounding Fournier's confession establish the risk or the probability that the confession was false.

Although I profoundly respect the criterion of the other members of the Court, and although I admire the objective quality of the majority opinion, I do not agree with the method of analysis whereby the conclusion is reached that the confession was involuntary. It is stated that the illegal detention per se does not prove that the confession was involuntary, and that the prolonged interrogation per se does not show that the confession was involuntary. But it tends to indicate that although each isolated factor does not show involuntariness, the combination of both factors produces it. If there is no psychological coercion under either of the two factors, the combination of the two does not necessarily produce psychological coercion. Naturally, the opinion may be interpreted to the effect that the illegal detention brought about some pressure of a considerable magnitude, although not enough per se to give rise to involuntariness, and that the circumstances attending the interrogation created also some pressure, although isolatedly insufficient, and that upon adding one pressure to the other, a new pressure, of greater and sufficient magnitude, is created. But the illegal detention, as a matter of fact, did not constitute coercion or pressure of any kind or magnitude, since in the decisive subsequent moment, at the beginning of the interrogation, Fournier had in no way been affected by the illegal detention; he enjoyed good health, was relaxed, well-fed, mentally alert, in full control of his will and his mental faculties and in an attitude of energetic defense of his rights and his personality, any pos-

sible adverse inference which might have arisen from the illegal detention being destroyed. As a matter of fact, from the fact itself of the duration of the interrogation, (only six hours) no undue pressure whatsoever affecting the will of Fournier arose. Nor did the fact that the prosecuting attorney told Fournier that at the time he had no right to be assisted by counsel lead to any such pressure as to shake down his will, for the reasons which I have already mentioned. Fournier's will remained firm notwithstanding the absence of counsel. As a matter of fact, there was no pressure impairing his will because the prosecuting attorney told Fournier that he had to make a statement, when Fournier himself rejected the veracity of that information, and there was no undue pressure impairing the will of an innocent man when Fournier was confronted with some evidence with which he was already acquainted. There was no combination of undue pressure and even if there were, their combination was not inherently sufficient to overwhelm Fournier's will to the extent of inducing him to make a false confession.

We shall consider briefly some of the cases decided by the Supreme Court of the United States as to the voluntariness of confessions when an allegation of psychological coercion is present. I say briefly, because in the opinion of this Court all those cases are broadly discussed. The cases in which it was held that the confessions were involuntary involved circumstances entirely different from those prevailing herein. For example, in *Watts* v. *Indiana*, *supra*, the defendant was questioned persistently by relays of officers (here only by one) during several continuous periods of times for *five days*, and on the last day he was questioned from six o'clock in the afternoon until three in the morning. The first two days he was in solitary confinement, in a cell called "the hole". He was not given opportunity either to sleep or to have adequate meals. In *Turner* v. *Pennsylvania*,

338 U. S. 62, 63, 64, the defendant was questioned during six days in different periods of time, by relays of officers, and from time to time other officers joined in the interrogation; whenever one of the police officers interested in the investigation had any free time, he would have the petitioner brought for questioning. In *Harris* v. *South Carolina*, 338 U. S. 68, 69, 70 the defendant was interrogated by relays of police officers in a small, hot room, relieving each other from time to time. He was questioned throughout the evening of Monday; on Tuesday the questioning continued from 1:30 in the afternoon until 1:00 in the morning, with only an hour of respite; on Wednesday several officers questioned him together for several hours. He was threatened with the arrest of his mother. The defendant was illiterate. In other cases, the defendant was either illiterate, or a young, ignorant and timid man, subjected to interrogations by relays of officers and, for example, for 36 uninterrupted hours with a light over his head. *Ashcraft* v. *Tennessee*, 322 U. S. 143. Such cases are totally inapposite to the case at bar. On the other hand, in other cases, the Supreme Court has held that the confessions were voluntary, even under circumstances more strenuous for the defendant than in the case at bar. In *Lisenba* v. *California*, 314 U. S. 219, 238, the petitioner, a mature, intelligent man with business experience, had been illegally detained for a period longer than in the case at bar, as indicated in the majority opinion. It was held that the confession was voluntary. *Gallegos* v. *Nebraska*, *supra*, was the case of a Mexican working as a farm hand who did not speak English. He was jailed in a small room for twenty-one hours and questioned for four days in Texas for an hour each day. In Nebraska he was questioned by three officers through an interpreter. Detention had been illegal. It was held that, notwithstanding this, the confession had been voluntary. In *Stein* v. *New York*, *supra*, detention was illegal and the

interrogation was more prolonged than in the case at bar. I believe it is evident that the cases of Lisenba, Gallegos and Stein are more applicable in their circumstances to the case at bar than those of Watts, Turner, Harris and Ashcraft. If we were to decide this case on the authorities laid down by the Supreme Court of the United States, we would have to conclude that defendant's confession was voluntary.

I entirely agree with the theory expressed in the opinion of this Court that the defendant's second confession at barrio San Antón in the morning of October 10, 1950, was voluntary. Considering that opinion alone, the uncontroverted evidence showed clearly that at San Antón the defendant was completely serene and tranquil, he spoke normally, his attitude was correct, he spoke and acted spontaneously, and he graphically explained, through spontaneous actions, the way and manner in which he had committed the crime, describing the scene and the crime in detail; defendant's actions were completely free; he made no objections about posing for photographs of the different stages of the crime as he had committed it. I have considered that confession, first in an isolated fashion, and I am aware of the rule that should there be two successive confessions, if the first is involuntary the second must also be presumed to be so. According to my theory, there is no need to apply such rule to this case since the first confession was not involuntary. But even assuming that it was, any possible presumption of involuntariness of the second was rebutted, since it is clear that upon confessing in San Antón the defendant was serene and tranquil, and was in no way affected by his alleged ordeal of the former night. What I would wish to emphasize is that the very attitude and conduct of the defendant in San Antón, a few hours after the first interrogation, show that on the previous night his will had in no manner been affected by any psychological coercion. Contrariwise, he

admitted at San Antón before reporters, freely, spontaneously and voluntarily that he had not been under the pressure of the prosecuting attorney on the previous night, that his first confession had been voluntary. That admission is of extraordinary importance as to the facts of the occurrences of the previous night, bearing specially in mind that all that he stated in San Antón was voluntary and trustworthy, which gives a greater probatory value to that admission of the defendant that he had not been coerced on the previous night. Even irrespective of that admission, from a realistic point of view I do not believe that a judgment and conviction should be set aside on the ground that the confession of the night of October 9 was involuntary, when a few hours later, at San Antón, the defendant coolly, serenely, with an absolute freedom of mind and will, explained his crime with all kinds of details, before a multitude of reporters. That fact shows that there was no coercion the previous night, and it particularly shows that he was in no way affected when he was confronted with horrifying evidence, when he himself reproduced the horror a few hours later with complete coolness before the photographers. The voluntary confession of San Antón destroys the involuntariness of the first confession, since defendant took it upon himself to demonstrate, not only that the circumstances surrounding the first confession had not created any risk of falsehood, thus dispelling the basis for the involuntariness doctrine, but also that such confession, essentially, had not been false.

The voluntariness of the confession of the night of October 9 was also shown by the statements of defendant's counsel, Lic. Rubén Gaztambide Arrillaga, on the afternoon of October 10, several hours after the first confession, statements made in open court upon the withdrawal by defendant, through counsel, of a petition for habeas corpus which he had filed. Mr. Gaztambide stated, as is set forth in the opinion,

that he had not been permitted to see the defendant for 80 hours, but that finally the defendant had told him that he had not been forced by the prosecuting attorney to testify or confess; and that his confession had been wholly voluntary and that the counsel affirmed that the confession had been voluntary. When expressing himself in this way, Mr. Gaztambide Arrillaga was speaking in representation of his client, it was the defendant who spoke. Gaztambide's statements were admissible in evidence in the instant case. There is no problem whatsoever of hearsay evidence, since the hearsay evidence rule is not applicable to, nor does it exclude, the admissions of a defendant made through an agent, as Gaztambide was of the defendant, since in a litigation, counsel for a defendant must be considered as defendant's agent and his admissions are the admissions of the defendant, so far only as he does so in the course of his employment, that is, within his authority to act as such agent. 4 Wigmore 43, § 1063, third ed. But it is stated in the opinion of this Court that the statements of Mr. Gaztambide Arrillaga were not admissible because they were not pertinent. I disagree with this opinion on the following grounds:

(1) Strictly speaking, Gaztambide's statements were pertinent to what was being litigated on the afternoon of October 10. It was a petition for habeas corpus and counsel's purpose, authorized by the defendant, was to withdraw the petition. One of the grounds for withdrawal was the fact that an information was to be filed and a bond fixed for defendant. But the information was to be filed because the confession had been made, and, therefore, the confession was pertinent to the dismissal, that is, the confession was pertinent to the statement of the counsel made in representation of the defendant.

(2) The true theory upon which the statements of a counsel in representation of his client become admissible is that the counsel proceeded upon his authority. Gaztambide

spoke under color of authority because what he stated was an incident of his power to manage the litigation, (4 Wigmore 43, 44), that is, it was a proper incident to the voluntary dismissal of the petition for habeas corpus.

(3) Gaztambide acted within the course of his authority because the defendant had authorized him to say what he did. Gaztambide stated that 80 hours had elapsed without his having been able to speak with the defendant but that the latter finally spoke with him and told him that the confession had been voluntary. It transpires that Gaztambide spoke with the defendant at some time on October 10, shortly after the first confession, and that the defendant had implicitly authorized him to state that the confession was voluntary.

(4) It being a question of pertinent matter, it is convenient to notice that, as stated in the opinion of this Court, the defendant in the case at bar objected to the admission of the document containing Gaztambide's statements but refused to set forth the grounds for his objection. An objection may not be considered on appeal unless the grounds therefor have been set forth in the court of first instance. This Court should not *motu proprio* excuse defendant's attitude in refusing to inform the Court of the grounds for his objection.

(5) Parting from the point of view of this dissenting opinion that the confessions were voluntary per se, if there was error in admitting Gaztambide's statements, such error could not have been prejudicial, because said statements merely corroborate the fact already established that the confessions were voluntary.

(6) Let us now consider the reality of the matter. A counsel who undoubtedly represents a defendant stands up in court and states that according to his own client's statements to him, to the client's attorney, the confessions had

been voluntary. Why should such statements have no pro-
batory value?

(7) The defendant never testified in court that Gaztam-
bide had spoken without his authority. The presumption
of authority was not overcome.

Assuming the admissibility and probatory value of the
statements of Mr. Gaztambide Arrillaga, I do not believe that
we should reverse the judgment on the basis that the first
confession was involuntary when defendant himself tells his
counsel that the confession was voluntary, and the attorney
ratifies said voluntariness in open court. I repeat that the
reversal under such circumstances is contrary to the reality
of this case. I have indicated that there is no problem regard-
ing the hearsay-evidence rule with respect to the statements
of Mr. Gaztambide Arrillaga. It could be contended that
such statements constitute double hearsay-evidence, that is,
a double violation of the rule. However, I understand that
it is the case of a "double exception" to the hearsay-evidence
rule. That when Gaztambide testified as to what defendant
had told him he was testifying as to admissions of the defend-
ant which do not fall within the hearsay-evidence rule, and
upon introducing evidence in this case as to Gaztambide's
statements in the former proceeding, it constitutes an excep-
tion to the rule, inasmuch as Gaztambide spoke as an agent
acting within the course of his authority as such.

Another factor which buttresses the theory that the con-
fession was voluntary lies in the fact that, in the case at
bar, upon setting forth his theory of defense, the defendant
took as a basis and therefore admitted in this same case, the
trustworthiness of the most important facts which were the
object of confession. The defendant adopted the confession
and waived the plea of involuntariness. If the doctrine of
involuntariness is predicated, as it is, on the view that the
circumstances surrounding the confession gave rise to a sub-
stantial risk that the confession was not true, if later defend-
ant himself not only admits that the facts which were the ob-

ject of the confession were true, but that he takes them as ground for his own theory of defense, it shows very forcefully that upon making the confession the defendant was not unduly pressed to admit facts that defendant himself afterwards states in open court as true, and shows impressively that there was no risk whatsoever that the confession was false. By ratifying the truth of the facts, he also ratified the validity of the confession containing those facts. Even if the theory of involuntary confessions were predicated on the privilege against self incrimination, he waived the effectiveness of that privilege, as well as any defects that might have arisen from the alleged violation of that privilege, upon admitting spontaneously, in open court, the truth of the facts which he had confessed.

The opinion of this Court tends to accept that the theory of the defense was equivalent to an adoption of the confession, but it indicates that the theory of the defense only referred to some confessed facts, but not to other essential and incriminatory facts which had been the object of confession. I do not believe that the concept of adoption may be thus fragmented. If the theory of the defense implied an acknowledgment and admission that most of the confession had been voluntary, then the rest of the confession was likewise voluntary. The confession formed a single body and a single unity, and it could not be fractioned to the extent of saying that part of the confession was voluntary while the other part was not. The acknowledgment of voluntariness must be extended to the whole confession. It cannot be said that the circumstances created a risk of falsehood as to part of the confession and that there was no such risk as to the other part. Defendant must not be permitted to assume the position of alleging successfully that a portion of the facts object of the confession is true, so much as benefits him, while the other part of the facts is untrue, because the confession was not voluntary, that is, voluntary insofar as it may be of advantage to the defendant and involuntary insofar as

it may be disadvantageous. Confirmation of parts may not be fragmented.

With respect to a similar problem concerning the confirmation of a confession by discovery of evidence of the facts confessed, Wigmore sets forth his personal view in 3 Wigmore 338, § 857, as follows:

"It will be observed that, in Mr. Leach's phrase, 'so much of the confession as relates strictly to the fact discovered by it' is to be received; in other words, the confirmation admits the part confirmed, and that only. Now this falls something short of the logic of the case; for a confirmation on material points produces ample persuasion of the trustworthiness of the whole. It can hardly be supposed that at certain parts the possible fiction stopped and the truth began, and that by a marvellous coincidence the truthful parts are exactly those which a subsequent search (more or less controlled by chance) happened to confirm. Such a differentiation is purely artificial, and corresponds to no actual mental processes, either of the confessor or of the hearer. If we are to cease distrusting any part, we should cease distrusting all."

Analyzing that question more carefully as indicated in the majority opinion, the defendant admitted in his theory of defense, the form and manner in which he had killed Iris Nereida, but he said nothing as to his conduct following the death which had been the object of the confession. It is evident that he adopted a very essential part of the confession, that he had killed Iris Nereida. Up to that point, as the Court states, there might have been an adoption. Now then, if the confession was voluntary (by self definition of the concept of adoption), as to that essential point, it also had to be, necessarily, voluntary as to the rest of the confession. We cannot draw an artificial line between the part of the confession referring to Iris Nereida's death and the part referring to the subsequent conduct of the defendant. There we have the example that the defendant implicitly admitted the part of the confession which suited his theory of mental or emotional incapacity, and did not disclose the part which

did not suit him for his theory as to his subsequent conduct. Said tactics should not be justified by this Court.

According to the theory which I have adopted that both confessions were clearly voluntary, the Judge did not have to charge the jury as to the effect of an involuntary confession on a subsequent confession, since there is no such involuntary confession herein. But even if the jury should have been charged as to that particular, the error, if any, was neither objected to, demurred, or raised on appeal, and it would not be prejudicial, first, if this Court reached the conclusion that both confessions were clearly voluntary as a matter of fact and of law and, second, because the rest of the evidence, aside from the confessions, was sufficient to support the conviction.

Even assuming that an error was committed in failing to instruct the jury as to the possible effect of the first confession on the second, said error was not prejudicial. I am convinced that there is no marked probability to the effect that the omission by the trial judge could have had any substantial effect on the verdict, first, because in my opinion, both the first confession and the confession at San Antón, were clearly voluntary. The jury had before it all the circumstances connected with the form and manner in which those two confessions were presented. There was no contradiction whatsoever in the evidence as to the circumstances surrounding the making of those two confessions. Even if the judge had charged the jury adequately as to the possible effect of the first confession on the second, I believe that the jury would still have reached the conclusion that there was no effect whatsoever, since the uncontroverted evidence clearly showed that both confessions were voluntary. It could not be contended that it was precisely for the jury to determine said voluntariness or said effect, and that such is not the function of this Court on appeal. But, as I shall try to prove hereinafter, the prevailing rule is to the effect that in order to determine whether or not an error was so prejudicial

as to warrant the reversal of the judgment, this Court should ask itself whether the circumstances of the case show that it was probable that the error had a prejudicial effect, that is, whether the circumstances of the case show that it was probable that the jury would have reached a different verdict if the error had not been committed. If all the rest of the evidence introduced, irrespective of the confessions, was clearly more than sufficient to show the guilt of the defendant and to justify a verdict of conviction and if this Court should reach the conclusion that the uncontroverted evidence shows that both confessions were voluntary, then all the probabilities would be to the effect that the fact of giving an instruction as to the relation between two confessions would have always produced the same result, that is, the same verdict of guilty and therefore, the reversal of the judgment would not lie.

It has been established that a court on appeal should not assume that all the errors are prejudicial, and the court must consider the whole record in order to determine whether the result has been substantially correct. *Nash* v. *United States*, 54 F.2d 1006. It has been also held by the Supreme Court of California in the case of *People* v. *González*, 24 Cal. 2d 870, 151 P.2d 251, that it is incumbent on the Supreme Court to determine on appeal whether the omission to adequately instruct the jury on the subject of voluntariness of a confession, and that said question is for the jury to determine, it is incumbent on the Supreme Court, I repeat, to determine whether such omission resulted in such a substantial miscarriage of justice that the judgment should be reversed. In said *González* case it was specifically held that where the evidence pointed to the guilt of the defendant beyond reasonable doubt, failure of the trial court to instruct the jury as to the voluntary nature of the confession did not result in a miscarriage of justice so as to warrant reversal of conviction, since, in that case, as stated by the Supreme Court of California, the jury would have come to the same conclusion had

the confession not been received or had the jury been expressly instructed that the question of the voluntary or involuntary nature of the confession was for it to determine.

In the case of *People* v. *Britton*, 6 Cal. 2d 10, 56 P.2d 491, it was held that the refusal of the trial judge to give an instruction requested by defendant relating to the value of a confession as evidence was not prejudicial and did not warrant reversal where there was sufficient evidence to prove defendant's guilt. It was held that the duty devolves upon the appellant to establish to a reasonable certainty that, without such error having been committed, the result of the trial would have been different, and the California Court states that after considering the complete evidence, it was so improbable as to be nearly inconceivable that any verdict other than one expressing the guilt of defendant would have been returned by the jury.

In the case of *Gore* v. *State*, 134 S. E. 2d 36, it is held that omission to charge the jury on the law of confessions, is not a prejudicial error if there is other sufficient evidence to warrant conviction.

In the case of *Rohlfs* v. *State*, 231 N. W. 266, it was held that the failure to charge the jury that an admission must be made with some degree of deliberation or voluntariness was not prejudicial, where evidence clearly showed that such admission was clearly deliberate.

In a case which originated in Puerto Rico, the Circuit Court of Appeals, First Circuit, *Garcia* v. *United States*, 10 F.2d 355, it was held that where evidence plainly warranted a verdict of guilty, only a plain and serious error in charging the jury would warrant reversal.

Although in the case of *Kotteakos* v. *United States*, 328 U. S. 750, the judgment was reversed because it was held that an error in the instructions had been prejudicial according to the special circumstances of the case, however, certain general rules which are useful in the decision of the case at

bar are established. For example, the "harmless error" rule is defined to the effect that said doctrine constitutes a judicial check upon arbitrary action and essential unfairness in trials, but at the same time it must not be applied in such a way as to give men fairly convicted the multiplicity of loopholes, (p. 760). It is also stated that there is a difference between a case where the evidence is balanced, where the "harmless error" rule may be applied more broadly, and a case where the clear evidence is one-sided against defendant, in which latter case the errors are not generally considered as prejudicial (p. 763). It is stated that if the error relates to the necessary minimum evidence legally sufficient to sustain the conviction, a reversal is in order because if such evidence or error is eliminated, the rest of the proof unaffected by the error would not be sufficient, and the prejudice would necessarily be substantial. It is held that, if with fair assurance one can say that the error itself had an effect or substantial influence on the verdict, the judgment must be reversed. In the case at bar, the error, if any, as to the relation between both confessions did not refer to the other evidence which was clearly sufficient to support a verdict of guilty. It is my opinion that there is no marked probability to the effect that said error had any substantial effect on the verdict, inasmuch as in view of the clear voluntariness of both confessions and from the clear evidence against the defendant, the verdict returned would have always been the same, regardless of the instruction which we are now discussing.

In the subsequent case of *Fiswick* v. *United States*, 329 U. S. 211, it is held that where an error in the instruction had any substantial influence on the result or where there are serious doubts as to that particular, the judgment must be reversed even if based on sufficient evidence. However, in that same opinion it is stated at pp. 218 and 220 that the proof of guilt was not strong and that the case against the defendant was weak whereby the error had a substantial influence in the result. In the instant case, the evidence

324

against the defendant was powerful and it was a strong case, and in view thereof and of the clearly voluntary nature of the confession I must conclude that the error had no substantial influence on the verdict.

I do not wish to close this dissenting opinion without citing the ruling of the Supreme Court of the United States with regard to confessions, speaking through Mr. Justice Jackson, in the case of *Stein* v. *New York, supra*, at pp. 196 and 197:

"We are not willing to discredit constitutional doctrines for protection of the innocent by making of them mere technical loopholes for the escape of the guilty."